1  STEVEN KAUFHOLD (SBN #157195)
   **AKIN GUMP STRAUSS HAUER & FELD LLP**
2  580 California, 15th Floor
   San Francisco, California 94104-1036
3  Telephone:    415-765-9500
   Facsimile:    415-765-9501
4  skaufhold@akingump.com

5  Attorneys for Plaintiff Catholic Healthcare West
   [Additional counsel appear on signature page.]
6

7

8              **UNITED STATES DISTRICT COURT**

9           **NORTHERN DISTRICT OF CALIFORNIA**

10              **SAN FRANCISCO DIVISION**

11

12  CATHOLIC HEALTHCARE WEST, a          Case No.  **C 07 4242**
    California non-profit corporation,
13
14              Plaintiff,
15        v.
                                          **COMPLAINT AND DEMAND FOR JURY**
16  KONINKLIJKE AHOLD N.V., a            **TRIAL FOR:**
    Netherlands public holding company, U.S.
17  FOODSERVICE, INC., a Delaware        1.  **VIOLATION OF RACKETEER**
    corporation, GORDON REDGATE, an          **INFLUENCED AND CORRUPT**
18  individual, and BRADY SCHOFIELD, an      **ORGANIZATIONS ACT, 18 U.S.C.**
    individual,                              **§§ 1961 *et seq.***
19
              Defendants.               2.  **BREACH OF CONTRACT**
20
21                                       3.  **FRAUDULENT INDUCEMENT**
                                             **CONCEALMENT AND**
22                                           **NONDISCLOSURE**

23                                       4.  **VIOLATION OF CAL. BUS. &**
                                             **PROF. CODE §§ 17200 *et seq.***
24
                                         5.  **UNJUST ENRICHMENT**
25
                                         6.  **IMPOSITION OF**
26                                           **CONSTRUCTIVE TRUST**

27                                       **CLASS ACTION**

28

COMPLAINT                                    1

Plaintiff Catholic Healthcare West ("CHW"), by and through its undersigned attorneys, based upon personal knowledge with respect to its own acts, and as to all other matters based upon the investigation of Plaintiff's counsel to date, hereby avers as follows:

**I.    Nature of the Complaint**

1.    CHW brings this action for damages, disgorgement, restitution and injunctive relief on behalf of itself and all others similarly situated against Koninklijke Ahold N.V. ("Royal Ahold"), U.S. Foodservice, Inc. ("USF"), Gordon Redgate ("Redgate") and Brady Schofield ("Schofield") for violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.*, ("RICO"), fraudulent inducement, concealment and nondisclosure, breach of contract, violation of California Business and Professions Code §§ 17200 *et seq.*, unjust enrichment and constructive trust.

2.    As the second largest broadline foodservice distributor in the United States, USF provides food products and services to approximately 250,000 customers.  CHW and USF's other customers purchased food and other products from USF with the expectation that USF would act honestly and in a commercially reasonable manner.  This case arises out of Defendants' schemes to falsely inflate the prices USF charged to its customers since at least 2000 through the use of shell companies, sham transactions and phony invoices.  Defendants implemented their schemes on a nationwide scale, effectively stealing hundreds of millions of dollars from innocent customers across the country including thousands of hospitals and restaurants.  CHW, the largest not-for-profit hospital system in California, brings this lawsuit to remedy Defendants' wrongful conduct and to recover the losses of CHW and of all others similarly situated, including treble and punitive damages.

3.    Under the schemes, USF, with the full knowledge, approval and participation of Royal Ahold, intentionally inflated the cost component (*i.e.*, "Landed Cost" or other similarly defined cost component) of the price it charged to its customers under contractual arrangements defining this price in terms of a cost component plus a mark-up or distribution fee (*e.g.*, cost-plus or margin-on-sell contracts).  These contractual arrangements are hereinafter referred to as "cost-plus contracts."  USF hid the inflation through the use of shell companies.  USF set up these shell companies for the sole purpose of posing as middlemen in the food distribution chain.  USF also inflated the cost component by persuading certain suppliers to pay promotional allowances unrelated to any actual value provided.

2

COMPLAINT

1    Six of the shell companies, ostensibly owned by Defendants Redgate and Schofield, were called

2    "Value Added Service Providers" ("VASPs"). They were so-called to hide and conceal from USF's

3    customers their true purpose: to pretend to buy and then re-sell food to USF at a higher "invoice cost."

4    USF then used the VASP transactions to calculate the cost component charged to USF's customers.

5    Over a period of several years, Defendants USF, Royal Ahold, Redgate and Schofield executed the

6    VASP scheme to "purchase" almost $8.5 billion in products and overcharge USF's customers,

7    including CHW, hundreds of millions of dollars.

8        4.    The existence of the VASPs was first disclosed to Royal Ahold shareholders in October

9    2003 as part of Royal Ahold's announcements that it would be restating its earnings for fiscal years

10   2000 and 2001 by more than $800 million after discovering accounting fraud at USF. Royal Ahold's

11   2003 announcements led the SEC, DOJ and Netherlands authorities to launch parallel investigations

12   into whether USF booked inflated and not yet earned "promotional allowances" from suppliers.

13       5.    As a result of those investigations, in October 2004, the SEC charged Royal Ahold and

14   its top three executives—Cees van der Hoeven, CEO, A. Michiel Meurs, CFO, and Jan Andreae,

15   EVP—with securities fraud. The company and two former executives settled the charges on October

16   18, 2004. Specifically, van der Hoeven and Meurs consented to orders barring them from serving as

17   officers or directors of a public company. Subsequently, in November 2005, Royal Ahold settled a

18   U.S. shareholder class action for $1.1 billion, and in May 2006, Royal Ahold's former CEO and CFO

19   were convicted of fraud in the Netherlands. Additionally, four former USF executives—Michael

20   Resnick, CFO, Mark Kaiser, Chief Marketing Officer, Timothy Lee, EVP of Purchasing, and William

21   Carter, VP of Purchasing, Supply Chain—have been convicted of, or pled guilty to, criminal charges

22   arising from the accounting fraud. In July 2004, Lee and Carter pled guilty to criminal securities fraud

23   and agreed to cooperate with investigators. Resnick later pled guilty to conspiracy to submit false

24   books, records and accounts and received three years probation. On May 17, 2007, Kaiser was

25   sentenced to seven years in prison. In addition to Royal Ahold, USF and their executives,

26   approximately a dozen co-conspirators from USF's supplier companies have pled guilty to fraud,

27   conspiracy and/or insider trading, including the two individual defendants in this matter—Schofield

28   and Redgate.

3

6.    While the prior SEC and DOJ investigations and shareholder suits addressed and resolved important issues of public trust and harm to Royal Ahold's shareholders, those investigations failed to redress a more pernicious harm, the harm to USF's customers. Moreover, Royal Ahold actively tried to cover-up the effects of the schemes on USF's customers through misleading financial statements issued as part of "resolving" USF's accounting fraud. USF and Royal Ahold both profited from this cover-up. This action will provide redress for USF's customers.

## II.    Jurisdiction and Venue

7.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1367, and 18 U.S.C. § 1964(c). This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(a), as the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states. This Court also has jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), providing for jurisdiction where, as here, "any member of a class of plaintiffs is a citizen of a State different from any defendant" and the aggregated amount in controversy exceeds five million dollars ($5,000,000), exclusive of interests and costs. See 28 U.S.C. §§ 1332(d)(2) and (6).

8.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), 18 U.S.C. § 1965 and the Governing Law and Venue provision in the National Distribution Agreement entered into by Premier, Inc. and USF's predecessor Alliant Foodservice, Inc. (the "Premier contract"). Premier and its affiliates (collectively "Premier") provide contracting services for certain categories of healthcare supplies, equipment and services. CHW is a Premier member and has purchased food-related products from USF pursuant to the Premier contract. A substantial part of the events giving rise to Plaintiff's claims occurred in this district, including many acts that were part of Defendants' unlawful conspiracy and their unlawful acts in furtherance thereof. Further, the ends of justice require that Defendants be brought before this Court for the adjudication of Plaintiff's claims.

4

COMPLAINT

**III.    Parties**

9.    Plaintiff CHW is a non-profit corporation organized under the laws of the State of California, with its principal place of business at 185 Berry Street, Suite 300, San Francisco, CA 94107.

10.    CHW is a system of dozens of hospitals and medical centers in California, Arizona and Nevada. Founded in 1986, CHW is one of the largest hospital systems in the nation and the largest not-for-profit hospital provider in California.

11.    In 1999, CHW and its hospitals and medical centers became members of Premier, Inc., a Group Purchasing Organization engaged in contracting services for its members to help them manage and reduce supply costs.

12.    Defendant Royal Ahold is a public holding company in The Netherlands with its principal place of business at Piet Heinkade 167 – 173, 1019 GM, Amsterdam, The Netherlands. As a part of its operations, Royal Ahold owns and operates grocery stores and food service companies in the United States and Europe through subsidiaries and affiliates. Royal Ahold's companies generated more than 44 billion euros in their fiscal year 2006.

13.    Defendant USF is a corporation organized under the laws of the State of Delaware, with its principal place of business at 9755 Patuxent Woods Drive, Columbia, Maryland 21046.

14.    Before it was purchased by Royal Ahold in April 2000, USF's stock was publicly traded on the New York Stock Exchange. In late 2001, Royal Ahold entered into an agreement through its subsidiary, USF, to acquire all outstanding shares of Alliant Exchange, Inc., the parent company of Alliant Foodservice, Inc. ("Alliant").

15.    Defendant Brady Schofield is an individual who, upon information and belief, resides in Naples, Florida. During the relevant period, Schofield was president and, upon information and belief, the principal owner of the following corporations:  (1) Frozen Farms, Inc., (2) Produce Solutions, Inc., (3) Seafood Marketing Specialties, Inc., and (4) Specialty Supply & Marketing, Inc.

16.    Defendant Gordon Redgate is an individual who, upon information and belief, resides in Chatham, New Jersey. During the relevant period, Redgate was president and, upon information and

5

COMPLAINT

1  belief, the principal owner of the following corporations: (1) Commodity Management Systems, Inc.

2  and (2) Private Label Distribution, Inc.

3  **IV.    Other Entities**

4      17.    Frozen Farms, Inc. ("Frozen Farms") was a corporation organized under the laws of the

5  state of Rhode Island, with its principal place of business in Middletown, Rhode Island. Frozen Farms

6  purportedly transacted in frozen and processed foods.

7      18.    Produce Solutions, Inc. ("Produce Solutions"), upon information and belief, was a

8  corporation organized under the laws of the state of Rhode Island, with its principal place of business

9  in Newport, Rhode Island. Produce Solutions purportedly transacted in produce.

10     19.    Seafood Marketing Specialists, Inc. ("Seafood Marketing Specialists") is a corporation

11  organized under the laws of the State of Rhode Island, with its principal place of business in

12  Middletown, Rhode Island. Seafood Marketing Specialists purportedly transacted in seafood products.

13     20.    Specialty Supply & Marketing, Inc. ("Specialty Supply & Marketing") was a

14  corporation organized under the laws of the State of Rhode Island, with its principal place of business

15  in New Bedford, Massachusetts. Specialty Supply & Marketing purportedly provided sales support.

16     21.    Commodity Management Systems, Inc. ("Commodity Management") is a corporation

17  organized under the laws of the State of New Jersey, with its principal place of business in Chatham,

18  New Jersey. Commodity Management purportedly transacted in frozen fruits and vegetables.

19     22.    Private Label Distribution, Inc. ("Private Brands") was a corporation organized under

20  the laws of the State of New Jersey, with its principal place of business in Summit, New Jersey.

21  Private Brands purportedly transacted in canned food products.

22  **V.    Class Allegations**

23     23.    Plaintiff brings this suit as a class action pursuant to Federal Rules of Civil Procedure

24  23(a), (b)(2) and (b)(3), on its behalf and as representative of the following classes of persons and

25  entities ("the Class"):

26      Any person in the United States who purchased products from USF pursuant to contractual
        arrangements in which the price paid was defined in terms of a cost component plus a mark-up,
27      and for which USF used a VASP transaction to calculate the cost component. Excluded from
        the Class are USF, USF's parent company, Royal Ahold, any other Royal Ahold or USF
28      subsidiary or affiliate, as well as any entity controlled by Royal Ahold or USF.

6

COMPLAINT

Additionally, any person in California who purchased products from USF pursuant to contractual arrangements in which the price paid was defined in terms of a cost component plus a mark-up, and for which USF used a VASP transaction to calculate the cost component. Excluded from the Class are USF, USF's parent company, Royal Ahold, any other Royal Ahold or USF subsidiary or affiliate, as well as any entity controlled by Royal Ahold or USF.

24.    The members of the Class are so numerous that separate joinder of all Class members is impracticable pursuant to Rule 23(a) of the Federal Rules of Civil Procedure. Although the exact number of class members is not yet known, on information and belief, USF has tens of thousands of customers who bought products pursuant to cost-plus contracts and thus who were overcharged as described herein. These customers are geographically dispersed throughout the United States.

25.    Questions of law or fact common to Plaintiff's claims and those of the Class predominate over any question of law or fact affecting only individual members of the Class. Questions of law and fact common to the Class include, *inter alia*, the following:

    a.    Whether USF engaged in the fraudulent schemes or artifices described herein;

    b.    Whether USF, together with Frozen Farms, Produce Solutions, Seafood Marketing Specialists, Specialty Supply & Marketing, Commodity Management, and Private Brands formed an association-in-fact enterprise (the "VASP Enterprise" as defined below) for the purpose of carrying out Defendants' scheme;

    c.    Whether Private Brands, Commodity Management, Frozen Farms, Produce Solutions, Seafood Marketing Specialists, and Specialty Supply & Marketing each constitute a separate enterprise (the "Individual VASP Enterprises" as defined below) for the purpose of carrying out Defendants' scheme;

    d.    Whether RICO Defendants USF, Royal Ahold, Redgate and Schofield were associated with the alleged enterprises to conduct or participate, directly or indirectly, in the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c);

    e.    Whether RICO Defendants USF, Royal Ahold, Redgate and Schofield engaged in a pattern of racketeering activity with the intent to defraud Plaintiff and the Class using the U.S. mails and interstate wire service in violation of 18 U.S.C. §§ 1341 and 1343 (mail and wire fraud);

    f.    Whether RICO Defendants USF, Royal Ahold, Redgate and Schofield engaged in a pattern of racketeering activity to hide, conceal and promote their scheme by laundering monetary instruments or engaging in monetary transactions involving criminally derived property in violation of 18 U.S.C. §§ 1956 and 1957;

7

COMPLAINT

g.    Whether RICO Defendants USF, Royal Ahold, Redgate and Schofield conspired to violate 18 U.S.C. § 1962(c) as prohibited by 18 U.S.C. § 1962(d);

h.    Whether USF's practices constituted a breach of its cost-plus contractual arrangements with its customers;

i.    Whether USF's practices unjustly enriched Royal Ahold when it accepted and retained the proceeds of the falsely inflated invoices; and

j.    Whether a constructive trust should be imposed on all the property Royal Ahold acquired as a result of Defendants' schemes.

26.    Plaintiff's claims are typical of the Class' claims because Plaintiff and other Class members purchased products from USF under cost-plus contractual arrangements at a price that USF unlawfully inflated through its schemes or artifices to defraud, including USF's use of VASPs to create false and inflated invoice costs used to calculate the cost component of the price charged to USF's customers.

27.    As Class Representative, CHW will fairly and adequately protect the interests of the Class, and to that end has engaged counsel experienced in both class actions and other complex litigation including federal RICO claims; CHW has no interests antagonistic to, or in conflict with, the Class it seeks to represent; and CHW will vigorously prosecute the claims of the Class through qualified and experienced counsel.

28.    Class representation is superior to other available methods for the fair and efficient adjudication of the controversy asserted herein because of the many questions of law and fact that are common to Plaintiff's claims and those of the Class. Any possible issues applicable to individual class members that may exist in managing this class action are greatly outweighed by the advantages of class treatment, particularly given the impact of the schemes across USF's broad customer base and the schemes' specific design to be implemented market-wide and operated in a manner to affect all USF's customers with cost-plus contractual arrangements.

29.    Class treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessarily duplicating evidence, effort, and expense that numerous individual actions would engender. The

8

COMPLAINT

advantages of class treatment include providing a method for redressing these claims that otherwise might not warrant individual litigation. A class action also eliminates the potential for inconsistent adjudication of multiple individual claims.

## VI.    Factual Background

### A.    The Nature of USF's Business

30.    USF is the second largest broadline foodservice distributor in the United States based on 2006 net sales. USF provides its products and services to approximately 250,000 customers.

31.    As part of its business operations, USF purchases food and related products from food manufacturers and other suppliers and then markets, sells and delivers those products to chain restaurants, independent restaurants, and healthcare, hospitality, government and educational facilities across the United States.

32.    When distributing food and related products, USF typically enters into a cost-plus arrangement with its customers. Under these contractual arrangements, USF agrees to charge its customer a price based on a cost component plus a mark-up of either a fixed percentage or a set dollar amount which is added on to the cost component of the agreement. The cost component that serves as USF's basis for the mark-up is typically referred to as "Landed Cost."

33.    Moreover, USF's cost-plus contractual arrangements allow the price charged to USF's customers to not account for the amount of promotional allowances paid by a supplier to USF.

34.    Promotional allowances are rebates, discounts, credits or similar consideration that suppliers provide to customers to promote the sale of their goods.

35.    Promotional allowances can take various forms including signing bonuses, volume-based programs, seasonal programs, growth programs, corporate marketing allowances, and local marketing funds and food shows.

36.    In some cases, suppliers pay a distributor a fixed sum of money up-front to encourage the distributor to carry or promote only that supplier's brands. Another type of allowance is known as a growth program under which a supplier agrees to rebate a percentage of the product's price to the distributor if the distributor increases sales of a given product over a specified period of time.

9

37.     A promotional allowance reduces the price the distributor pays to acquire a product that it intends to re-sell.  Correspondingly, the promotional allowance paid by the supplier to the distributor reduces the supplier's profit margin.

38.     Distributors often refer to promotional allowances as "sheltered income" because they do not appear on the distributor's purchase orders or invoices received from the supplier.

**B.     Defendants' Schemes to Defraud**

39.     Defendants designed and executed schemes to defraud their customers, including CHW, by falsely inflating the cost component of the price charged to their cost-plus customers.  Typically, the schemes took one of two forms.

**1.     The VASP Scheme**

40.     One scheme involved creating and controlling fictitious middleman companies between USF and the food supplier.  Defendants misleadingly called six of these middlemen Value Added Service Providers to suggest that they added some economic value to the distribution chain.

41.     Simply put, USF falsely inflated the cost component it charged to its customers, and USF used the VASPs to conceal these overcharges from its customers.  In many cases, USF negotiated a purchase price for products from suppliers, directed the VASPs to "purchase" those products at that negotiated price, funded the "purchase," and then directed the VASPs to "resell" the same products at a falsely inflated price to USF.  USF would then use the falsely inflated price to calculate the cost component it charged to its customers.  At the same time, USF would direct the VASPs to kick back to USF the difference between the falsely inflated price the VASPs "charged" USF for the product and the original price USF negotiated with the suppliers, less a minimal "transaction fee."

42.     In reality, the VASPs had no legitimate or commercially reasonable business purpose.  Instead, they served only as vehicles to falsely increase the cost component of the price charged to USF's customers and to generate a bogus paper trail that would conceal USF's illegal conduct from its customers.

43.     Although independently owned, USF effectively controlled the VASPs and directed their business on a daily basis.  VASP related transactions with USF accounted for almost one-fifth of all of USF's purchases.  In fact, Royal Ahold stated in its fiscal year 2002 Form 20-F, filed on October

10

COMPLAINT

16, 2003, that the VASPs' "sales" to USF during the period from 2000 to 2003 totaled approximately eight billion euros and that these sales included primarily private label and signature brand products.

44.    In its 2004 Form 20-F, filed on April 14, 2005, Royal Ahold further disclosed an additional four hundred and eighty nine million euros in VASP "sales" to USF, and stated that USF ended its relationship with five of the VASPs through a phased transition of services.

45.    USF and Royal Ahold funded the VASPs' operations through interest-free advances and financial guarantees and 100% of the VASPs' shares were assigned and irrevocably transferred to USF as collateral for these advances.

46.    Indeed, the VASPs were not provided with any owner-supplied funding whatsoever and the "transaction fees" paid to the VASPs were intentionally structured to enable the VASPs to "break even."

47.    Defendants Schofield and Redgate knew each other and were in frequent contact.  In fact, Schofield, Redgate and a USF executive who supervised the fraudulent VASP scheme on a day-to-day basis, were sometimes referred to around USF's offices as "the Three Musketeers."

48.    Royal Ahold, Redgate and Schofield all had knowledge of, and willingly participated in, the orchestrated scheme to use the VASPs to falsely inflate the invoice cost used to calculate the cost component so that they could in turn defraud USF's customers.  Furthermore, Redgate had knowledge that USF was buying certain categories of food products through Schofield's VASPs and Schofield had knowledge that USF was buying other types of food products through Redgate's VASPs.

49.    For example, Defendant Redgate created Private Brands, one of the VASPs, at the request of USF.  The purpose for establishing Private Brands was to create an entity to put a "spread" on the goods that USF sold to its customers.

50.    Private Brands did not negotiate contracts with the suppliers, USF did.  Private Brands only placed orders that USF instructed it to place, from the suppliers USF told it to order from, at a price negotiated directly between the supplier and USF.

51.    Upon information and belief, Private Brands did not take possession of the food and related products it ordered at USF's direction.  Nor did Private Brands have sufficient funds to pay for the products it ordered without interest-free loans from USF.

11

52.    Under the VASP scheme, USF would negotiate a price directly with a supplier.  For example, USF would negotiate a price directly with the supplier for $10 a case for whole kernel cut corn.  Then USF would place an order with Private Brands which would, in turn, place the order for the corn with the supplier for the price of $10 a case.  Private Brands would pretend to re-sell the corn to USF for $14.  Accordingly, Private Brands would bill USF $14 for the case of corn.

53.    The $4 that Private Brands increased the price of the corn above the price USF negotiated with the corn supplier was called a "bucket."  After USF paid Private Brands the $14, Private Brands would kick-back the "bucket," *i.e.*, the difference between the $14 and USF's previously negotiated price of $10, or $4, directly to USF minus a small pre-determined transaction fee for each invoice.

54.    In some cases, the corn supplier would also agree to provide an unearned promotional allowance.  During the early days of the scheme, the supplier would first pay the promotional allowance to Private Brands and Private Brands would forward the promotional allowance to USF (in addition to the $4 "bucket").  Later, USF directed the supplier to pay the unearned promotional allowance on transactions funneled through Private Brands directly to USF.

55.    USF would then calculate the cost component used to bill its customers using the $14 from the Private Brands transaction.  On information and belief, USF would book the $4 "bucket" in its accounting records as if it represented an earned, commercially reasonable promotional allowance paid by a supplier.

56.    However, the $4 added by Private Brands to the cost of the corn in the above example was not an earned promotional allowance or other commercially reasonable rebate.  Private Brands was not a real supplier.  It was merely a straw-man posing as a supplier.

57.    The "buckets" of money sent from the VASPs to USF thus were structured to look like honestly earned and commercially reasonable rebates or promotional allowances when in fact they were not.  The bucket payments also were designed to hide from USF's customers the "cost" falsely added by the scheme to USF's invoices.

58.    USF deceived its customers into believing that USF's cost component was calculated based on using transactions with only legitimate suppliers.  The scheme was designed to, and did,

COMPLAINT

induce USF's customers to rely on USF's material representations, enter into contracts with USF, place

orders for products from USF, and make payments to USF. Moreover, such reliance was reasonable

under the circumstances because Defendants intentionally used the VASPs to hide the scheme from

USF's customers and concealed from, and at no time fully disclosed to, USF's customers the existence

and true purpose of the VASPs.

59.    Another company owned by Defendant Redgate, Commodity Management, was used in

the same way that USF controlled and operated Private Brands.

60.    On information and belief, four companies owned by Defendant Schofield were also set

up at USF's direction and operated like Private Brands as VASPs. Those companies were Frozen

Farms, Produce Solutions, Seafood Marketing Specialists, and Specialty Supply & Marketing. They

were all similar to Private Brands in that they were set up at USF's direction to falsely create a spread

on the cost of products USF sold to its customers.

61.    Upon information and belief, each VASP operated in a substantially similar manner

throughout the relevant period.

**2.    Commercially Unreasonable Promotional Allowances**

62.    Under another scheme, USF would enter into an agreement with a supplier under which

the supplier would agree to a price for the sale of the goods. Thereafter, the supplier would agree to

issue an invoice to USF with a price higher than the supplier otherwise would have charged to USF,

while at the same time agreeing to give USF a higher and off-setting unearned promotional allowance.

63.    As an example, a supplier's regular price for an item might be $1.20 and under normal

circumstances the supplier would give the distributor an earned 20 cent promotional allowance, thus

accepting a price of $1.00. In that instance, USF's invoice cost, the cost used to calculate the cost

component billed to its customers and on which its mark-up would be added, would be $1.20.

64.    Under USF's scheme, however, USF would persuade the supplier to invoice USF $1.40

and then rebate 40 cents to USF which would include the normal earned 20 cent promotional

allowance and another 20 cents that was unrelated to any earned promotional allowances or rebates.

Under the scheme, thus, the invoice cost used to calculate the cost component would be $1.40 -- rather

COMPLAINT

than $1.20 – even though the supplier's net price was the same as it would have been in the absence of the scheme.

65.    In fact, however, the falsely inflated 20 cent payment to USF represented an amount that would otherwise not have been offered as a promotional allowance and exceeded the amount of promotional allowance the supplier was otherwise willing to pay.  That additional 20 cent payment was not a commercially reasonable promotional allowance paid by the supplier or earned by USF.

66.    The effect of the scheme was also to allow USF to overcharge its customers by enabling USF to compute the cost-plus price charged to its customers based on a falsely inflated cost component.

C.    **Premier's Contracts with USF and CHW's USF Purchases**

67.    Effective June 30, 2000, Premier and USF's predecessor Alliant entered into the Premier contract, which was in effect until June 29, 2005.  From 2000 to 2004, this contract was modified three times with "Alliant Foodservice, Inc. d/b/a U.S. Foodservice" executing the amendments as the foodservice distributor.  In 2005, this contract was modified again with "U.S. Foodservice" executing the amendment as the foodservice distributor.

68.    The Premier contract permitted Premier's Members who desired to participate in the contract benefits ("Participating Members") to designate USF as their "sole-source national broadline food and supply foodservice distributor."

69.    The Premier contract also provides that Participating Members are third-party beneficiaries of the contract, and are entitled to enforce certain terms and provisions of the agreement to the same extent as Premier, including but not limited to the terms and provisions at issue here.

70.    Premier Participating Members' purchases from USF (and its predecessor Alliant) totaled approximately $3.5 billion from 2000 to 2005.

71.    CHW has been a Premier Member since 1999.  Over a two and a half year period, from 2001 to 2004, CHW spent approximately $71.1 million on food-related products purchased from USF pursuant to the Premier contract.

72.    Shortly after USF acquired Alliant, USF converted Premier's Participating Members from purchasing Alliant products to USF private label and signature brand products, many of which

14

COMPLAINT

1   were purchased through the VASPs. At the time, Premier's Participating Members were purchasing

2   between $700 and $850 million in products from USF each year. On information and belief, CHW

3   purchased USF private label and signature brand products including Patuxent Farms, U.S. Red, U.S.

4   Blue, Monarch, Glenview Farms, Thirster, Roseli, Perfecta, el Pasado Mexican Cuisine, and

5   Monogram products.

6       73.    The Premier contract required USF to bill Participating Members a price equal to a cost

7   component plus a distribution fee or mark-up. The distribution fee was expressed as a percentage or as

8   a fixed dollar amount. The price charged to Participating Members was to equal the cost component

9   plus the agreed on mark-up less any promotional allowance exclusively negotiated by Premier or

10  negotiated on the behalf of Premier.

11      74.    For many products, the price listed on the invoice issued by USF's vendors or other

12  similar types of entities was to be used in calculating the cost component.

13      **D.    USF's Pattern of Defrauding CHW and other Class Members**

14      75.    USF's dummy sales dealings with the VASPs and its falsely inflated promotional

15  allowances with suppliers were self-contained schemes that operated independently from any single

16  contract with Premier, CHW or USF's other customers. USF's schemes were not specifically designed

17  to defraud only Premier and its Participating Members, including CHW, but rather represented a

18  systematic way of doing business that was independent of any particular contract or specific customer.

19      76.    On information and belief, between 2000 and 2004, USF engaged in thousands of

20  separate fraudulent transactions in furtherance of its schemes to falsely inflate the cost component of

21  the price charged to its customers. Details regarding the dates, times, products purchased, and the

22  amount of the false spread added by the VASPs, which occurred on a daily basis for a period of several

23  years from at least 2000 until 2004, remain in the exclusive control of Defendants.

24      77.    USF's schemes to defraud its customers by falsely inflating the cost component of the

25  price were further concealed under the guise of complying with the terms of its cost-plus contractual

26  arrangements. USF utilized the VASPs and the other methods of deception described above to falsely

27  inflate the cost component of the price charged to USF's customers since at least 2000, and continued

28  to operate the schemes, as described above, at least until 2004. Since at least 2000, USF has repeatedly

COMPLAINT

1    and regularly conducted the schemes described above for the specific purpose of obtaining money or

2    property that rightfully belongs to its customers.

3        **E.    Royal Ahold's Participation in the Schemes**

4        78.    Prior to, and as part of, its acquisition of USF, Royal Ahold was aware of weaknesses in

5    USF's ability to track promotional allowances and a lack of an internal control system.

6        79.    Prior to, and as part of, its acquisition of USF, Royal Ahold was aware that the VASPs'

7    purpose was to "shelter and earn similar 'rebates' on [USF's] private label brands and to hide PA's

8    [promotional allowances] from clients' auditors." *See* PricewaterhouseCoopers Report on U.S.

9    Foodservice, Ex. 2 (June 25, 2003).

10       80.    In fact, on or about February 20, 2000, an email memorandum about the existence and

11   purpose of the VASPs was sent by Royal Ahold's Vice President of Internal Audits, Paul Ekelschot, to

12   Royal Ahold executives Cees van der Hoeven (Royal Ahold CEO), Michiel Meurs (Royal Ahold

13   CFO), Jan Andreae (Royal Ahold Executive Board Member), Allan Noddle (Royal Ahold Executive

14   Board Member), Robert Tobin (Royal Ahold Executive Board Member), Ton van Tielraden (Royal

15   Ahold Senior Vice-President Legal Affairs and General Counsel), Andre Buitenhuis (Royal Ahold

16   Senior Vice President Finance and Fiscal Affairs), Bert Verhelst (Royal Ahold Senior Vice-President

17   Administration), Ernie Smith (Royal Ahold USA CFO), Carol Greczner (Royal Ahold USA Senior

18   Vice-President Audit), and David Herskovits (Deloitte Auditor).  See E-mail from Paul Ekelschot to

19   Cees van der Hoeven, et al. (Feb. 20, 2000) (attached hereto as Exhibit 1).  None of these board

20   members are currently serving at Royal Ahold.

21       81.    Moreover, in 2001, USF's president and Chief Executive Officer since 1997, Jim Miller,

22   was appointed to the Royal Ahold Corporate Executive Board.

23       82.    In addition to its full knowledge about the existence and purpose for the VASPs, Royal

24   Ahold guaranteed certain obligations of the VASPs relating to purchases made on behalf of USF.  As of

25   December 29, 2002, those guarantees totaled approximately 221 million euros.  On information and

26   belief, Royal Ahold used financial institutions, the mails and/or the wires, as specified below, in

27   providing such guarantees.

28

COMPLAINT

83. Thus, Royal Ahold was aware of the true nature and purpose of the VASPs and knowingly provided financial guarantees to the VASPs to aid USF in carrying out its VASP scheme.

84. Royal Ahold continued to provide these guarantees after receiving a memorandum on April 12, 2001, from former USF CFO Ernie Smith, that stated that the VASPs "allow them to establish pads to income." See Memorandum from Ernie Smith to Michiel Meurs (Apr. 12, 2001) (attached hereto as Exhibit 2).

85. Royal Ahold's guarantees furthered the operation of the enterprises alleged herein and Royal Ahold participated with USF in continuing, executing, profiting from and concealing the VASP scheme.

86. As part of such participation, Royal Ahold sought and obtained a legal opinion in or around 2000 about the operation of the VASP scheme which was later withdrawn as improvidently provided. At a minimum, this legal opinion was designed to further, and did conceal the VASP scheme from USF's customers.

**F.  Royal Ahold's Financial Restatement and Civil and Criminal Investigations of U.S. Foodservice**

87. On February 24, 2003, Royal Ahold announced that its net earnings and earnings per share would be lower than previously indicated for 2002. Royal Ahold also said it would restate its financial statements for fiscal years 2000 and 2001.

88. Royal Ahold indicated that the restatements were caused by overstatements of vendor allowance income at its USF subsidiary. The fraud stemmed from USF's booking of inflated and not yet earned promotional allowances from suppliers.

89. Following the accounting restatements, the SEC, DOJ and Netherlands authorities launched parallel investigations into USF's conduct. As a result of those investigations, in October 2004, the SEC charged Royal Ahold and its top three executives with securities fraud. Royal Ahold and two former executives settled the charges on October 18, 2004. Subsequently, in May 2006, Royal Ahold's former CEO and CFO were convicted of fraud in the Netherlands. Additionally, four former USF executives—Michael Resnick, CFO, Mark Kaiser, Chief Marketing Officer, Timothy Lee, EVP of

COMPLAINT

1  Purchasing, and William Carter, VP of Purchasing, Supply Chain—have been convicted of or pled

2  guilty to criminal charges arising from the accounting fraud.

3      90.    At least a dozen co-conspirators from the VASPs and USF's suppliers have pled guilty

4  to fraud, conspiracy and/or insider trading. In November 2005, Royal Ahold settled a U.S. shareholder

5  class action for $1.1 billion.

6      91.    Nevertheless, Royal Ahold has continued to issue misleading and false statements about

7  the role of the VASPs. In its 2002 Form 20-F, issued on October 16, 2003, for example, Royal Ahold

8  first disclosed the existence of the VASPs to its shareholders and suggested that they had a legitimate

9  economic role in the distribution chain by claiming that the VASPs "purchase[d] certain commodities

10  and products from third parties" and that they then resold such products to USF.

11      92.    Moreover, Royal Ahold falsely implied in the same Form 20-F that the VASPs were

12  legitimate participants in the distribution chain when it said that the VASPs "provide varying degrees

13  of support to USF primarily in the purchase of private label and signature brand products." In fact, the

14  only "support" provided by the VASPs were as vehicles through which the Defendants conducted the

15  VASP scheme.

16      93.    In the same Form 20-F, Royal Ahold likewise misleadingly described the VASPs' role

17  when it described the purpose of USF's direct negotiations with the suppliers from whom the VASPs

18  placed orders on behalf of USF. Royal Ahold stated that the purpose of those direct negotiations was

19  to "ensure price, product specifications and quality requirements" when in fact the real purpose of

20  those direct negotiations was to manage and control the VASPs' transactions with those suppliers.

21      94.    Royal Ahold's disclosure about the VASPs in its 2002 Form 20-F was designed to give

22  the appearance of "full disclosure," while in reality continuing to shroud in a false and misleading light

23  the true nature of the VASP scheme. As a result, USF's customers were, at best, further misled and

24  prevented from learning the true nature of the VASP scheme, at the time of Royal Ahold's so-called

25  disclosure.

26      95.    In 2006, USF also sent correspondence to customers denying any wrongdoing with

27  regard to the VASP scheme. All such disclosures and correspondence were designed to protect and

28

COMPLAINT

retain the benefits Defendants and their shareholders wrongfully obtained through the operation and execution of the VASP scheme.

## COUNT I

**Violation of RICO, 18 U.S.C. § 1962(c):  Against Defendants Royal Ahold, U.S. Foodservice, Redgate and Schofield for Conducting the Affairs of the VASP Enterprise through a Pattern of Racketeering Activity**

96.    Plaintiff repeats and re-avers each and every statement contained in Paragraphs 1 through 95 above.

97.    Defendants Royal Ahold, USF, Redgate and Schofield are all "persons" capable of holding a legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

98.    Defendants Royal Ahold, USF, Redgate and Schofield have violated 18 U.S.C. § 1962(c) by the acts described in the prior paragraphs, and as further described below.

### The VASP Enterprise

99.    Defendant USF, together with Frozen Farms, Produce Solutions, Seafood Marketing Specialists, Specialty Supply & Marketing, Commodity Management, and Private Brands form an association-in-fact for the common and continuing purpose described herein including Paragraphs 40 to 61 above, and constitute an enterprise within the meaning of 18 U.S.C. § 1961(4) (the "VASP Enterprise").  The members of the VASP Enterprise have functioned as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity.  The VASP Enterprise has been engaged in, and its activities have substantially affected, interstate commerce.

### The Pattern of Racketeering Activity

100.    Defendants Royal Ahold, USF, Redgate and Schofield, each of whom are persons associated with, or employed by, the VASP Enterprise, did knowingly, willfully and unlawfully conduct or participate, directly or indirectly, in the affairs of the VASP Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c).  The racketeering activity was made possible by each Defendant's regular and repeated use of the facilities and services of the VASP Enterprise.  Defendants Royal Ahold, USF, Redgate and Schofield had the specific intent to engage in the substantive RICO violation alleged herein.

COMPLAINT

101.    Predicate acts of racketeering activity are acts which are indictable under provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(1)(B), as more specifically alleged below.  Defendants Royal Ahold, USF, Redgate and Schofield each committed at least two such acts or else aided and abetted such acts.

102.    The acts of racketeering were not isolated, but rather the acts of Defendants Royal Ahold, USF, Redgate and Schofield were related in that they had the same or similar purpose and result, participants, victims and methods of commission.  Further, the acts of racketeering by Defendants Royal Ahold, USF, Redgate and Schofield have been continuous.  There was repeated conduct in a closed, but substantial, period of time at least during the period from 2000 to 2004.

**Mail Fraud**

103.    Defendants committed acts constituting indictable offenses under 18 U.S.C. § 1341, in that they devised or intended to devise a scheme or artifice to defraud CHW and other Class members, or to obtain money or property from CHW and other Class members by means of false or fraudulent pretenses, representations or promises.  For the purpose of executing their scheme or artifice, Defendants caused delivery of various documents and things by the U.S. mails or by private or commercial interstate carriers, or received such therefrom.  The acts of Defendants set forth above were done with knowledge that the use of the mails would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended.  These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme or artifice.

104.    Defendants carried out their scheme in different states and could not have done so unless they used the U.S. mails or private or commercial interstate carriers.  One part of Defendants' VASP scheme required USF to send directions to the VASPs to place orders for products at prices negotiated by USF and for the VASPs to then send falsely inflated invoices to USF.  USF also provided interest-free loans, and Royal Ahold provided financial guarantees, to the VASPs.  Another part of Defendants' fraudulent scheme involved USF sending falsely inflated invoices or other demands for payment to its customers, including CHW and other Class members.  Upon information and belief, in connection with the sending or receipt of such materials, Defendants caused to be delivered interstate

COMPLAINT

1  communications that contained false or fraudulent statements, or things not themselves false or

2  fraudulent but which were essential parts of Defendants' scheme.

3     105.    In furtherance of the VASP scheme, Royal Ahold disseminated its 2002 Form 20-F and

4  other correspondence about the VASPs through the U.S. mails and over U.S. wires.

5                                       **Wire Fraud**

6     106.    Defendants committed acts constituting indictable offenses under 18 U.S.C. § 1343, in

7  that they devised or intended to devise a scheme or artifice to defraud CHW and other Class members,

8  or to obtain money or property from CHW and other Class members by means of false or fraudulent

9  pretenses, representations or promises.  For the purpose of executing their scheme or artifice,

10  Defendants transmitted or caused to be transmitted by means of wire communications in interstate or

11  foreign commerce various writings, signs, and signals.  These acts were done intentionally and

12  knowingly with the specific intent to advance Defendants' scheme or artifice, or with knowledge that

13  the use of the wires communications would follow in the ordinary course of business, or that such use

14  could have been foreseen, even if not actually intended.

15     107.    Defendants carried out their scheme in different states and countries and could not have

16  done so unless they used the interstate wires.  Upon information and belief, Defendants used the

17  interstate wires on a daily basis when sending directions to the VASPs to place orders for products at

18  prices negotiated by USF and when the VASPs then sent falsely inflated invoices to USF.  USF also

19  provided interest-free loans, and Royal Ahold provided financial guarantees, to the VASPs that also,

20  upon information and belief, required, and were furthered by, the use of interstate wires.  Likewise,

21  upon information and belief, USF regularly used the wires to send falsely inflated invoices or other

22  demands for payment to its customers, including CHW and other Class members.  USF thereby used

23  the wires thousands of times to transmit false and fraudulent statements, or communications

24  themselves not false or fraudulent but which were essential to carrying out Defendants' scheme.

25

26

27

28

                                            21

COMPLAINT

1

**Money Laundering**

2          108.   Defendants committed acts constituting indictable offenses under 18 U.S.C. § 1956 in

3    that, knowing that funds they received from CHW and other Class members constituted the proceeds

4    of unlawful activity including mail and wire fraud, Defendants conducted and attempted to conduct

5    certain financial transactions affecting interstate commerce involving these proceeds.

6          109.   These proceeds were the portions of payments received by USF from CHW and other

7    Class members as a result of the scheme alleged herein, *i.e.*, payments for the falsely inflated cost

8    components used by USF to calculate the price charged to its customers, and payments for USF's

9    increased mark-ups or distribution fees resulting from USF's use of falsely inflated costs to calculate

10   such mark-ups or distribution fees.

11         110.   Upon information and belief, the financial transactions conducted by Defendants

12   affecting interstate commerce involved the deposit and withdrawal of these proceeds in and from

13   financial institutions, as well as the movement of these proceeds by wire or other means between USF

14   and the VASPs, and between the VASPs and USF as part of the scheme alleged herein.

15         111.   These financial transactions conducted by Defendants were intended to promote the

16   carrying on of the mail and wire fraud by making the VASPs appear to have a legitimate business

17   purpose, and to hide from CHW and other Class members the false "cost" added to USF's invoices.

18         112.   Defendants further had knowledge that these financial transactions were designed to,

19   and did, conceal and disguise the nature, location, source, ownership or control of the proceeds of the

20   mail and wire fraud, by making it appear that the full invoice amount belonged to the VASPs, when in

21   fact the VASPs kicked back a portion of the invoice price, representing the proceeds of the mail and

22   wire fraud, to USF, and thus hiding the falsely inflated cost component from its clients' auditors.

23         113.   Defendants committed acts constituting indictable offenses under 18 U.S.C. § 1957 in

24   that they knowingly engaged in and attempted to engage in monetary transactions affecting interstate

25   commerce and involving funds received from CHW and other Class members, which Defendants knew

26   to be the proceeds of mail and wire fraud and criminally derived property from unlawful activity as

27   described above, of a value greater than $10,000.

28

22

COMPLAINT

114.    Defendants, upon information and belief, deposited these funds in financial institutions, and withdrew, transferred and exchanged such funds from those financial institutions.

### Injury to CHW and other Class Members' Business or Property

115.    CHW and the Class have been proximately injured in their business or property by reason of Defendants' violation of 18 U.S.C. § 1962(c).

### COUNT II
### Violation of RICO, 18 U.S.C. § 1962(c): Against Defendants Royal Ahold, U.S. Foodservice, Redgate and Schofield for Conducting the Affairs of the Individual VASP Enterprises through a Pattern of Racketeering Activity

116.    Plaintiff repeats and re-avers each and every statement contained in Paragraphs 1 through 115 above.

117.    Defendants Royal Ahold, USF, Redgate and Schofield are all "persons" capable of holding a legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

118.    Defendants Royal Ahold, USF, Redgate and Schofield have violated 18 U.S.C. § 1962(c) by the acts described in the prior paragraphs, and as further described below.

### The Individual VASP Enterprises

119.    The Private Brands, Commodity Management, Frozen Farms, Produce Solutions, Seafood Marketing Specialists, and Specialty Supply & Marketing Enterprises each constitute a separate enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Individual VASP Enterprises"). Each Individual VASP Enterprise has been engaged in, and their activities have substantially affected, interstate commerce.

### The Pattern of Racketeering Activity

120.    Defendants Royal Ahold, USF, Redgate, and Schofield knowingly participated in, directly or indirectly, the operation and management of each of the Individual VASP Enterprises through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c).  The racketeering activity was made possible by each Defendant's regular and repeated use of the facilities and services of each Individual VASP Enterprise.  Defendants Royal Ahold, USF, Redgate and Schofield had the specific intent to engage in the substantive RICO violation alleged herein.

COMPLAINT

1    121.    The predicate acts of racketeering activity are acts which are indictable under provisions

2    of the U.S. Code enumerated in 18 U.S.C. § 1961(1)(B), as more specifically alleged below.

3    Defendants Royal Ahold, USF, Redgate and Schofield each committed at least two such acts or else

4    aided and abetted such acts.

5                                             **Mail Fraud**

6    122.    Plaintiff repeats and re-avers each and every statement contained in Paragraphs 103 to

7    105 above.

8                                             **Wire Fraud**

9    123.    Plaintiff repeats and re-avers each and every statement contained in Paragraphs 106 and

10   107 above.

11                                        **Money Laundering**

12   124.    Plaintiff repeats and re-avers each and every statement contained in Paragraphs 108 to

13   114 above.

14            **Injury to CHW and other Class Members' Business or Property**

15   125.    CHW and the Class have been proximately injured in their business or property by

16   reason of Defendants' violation of 18 U.S.C. § 1962(c).

17                                          **COUNT III**
     **Violation of RICO, 18 U.S.C. § 1962(d):  Against Defendants Royal Ahold, U.S. Foodservice,**
18                              **Redgate and Schofield**

19   126.    Plaintiff repeats and re-avers each and every statement contained in Paragraphs 1

20   through 125 above.

21   127.    In violation of 18 U.S.C. § 1962(d), Defendants Royal Ahold, USF, Redgate, and

22   Schofield conspired to violate § 1962(c).  The conspiracy commenced at least as early as 2000 and

23   continued at least until 2004.

24   128.    The object of the conspiracy was to use dummy corporations to falsely inflate invoices

25   to obtain money or property rightfully belonging to CHW and other Class members.

26   129.    Each Defendant knowingly, willfully and unlawfully agreed and combined to conduct

27   or participate, directly or indirectly, in the conduct of the affairs and activities of the VASP Enterprise

28   and/or the Individual VASP Enterprises through a pattern of racketeering activity, including acts

                                                24

COMPLAINT

1  indictable under 18 U.S.C. §§ 1341 and 1343, in violation of 18 U.S.C. § 1962(c). Royal Ahold, USF,

2  Redgate, and Schofield each objectively manifested their agreement to the commission of the

3  substantive RICO violations by at least one member of the conspiracy by words or acts.

4       130.   Each Defendant committed at least one overt act of racketeering or other wrongful

5  activity in furtherance of such conspiracy.

6       131.   Even if some of the Defendants did not agree to harm specifically CHW or other Class

7  members, the purpose of the acts that caused them injury was to advance the overall object of the

8  conspiracy, and the harm to CHW or other Class members was a reasonably foreseeable consequence

9  of Defendants' VASP scheme.

10              **Injury to CHW and other Class Members' Business or Property**

11       132.   CHW and the Class have been proximately injured in their business or property by

12  reason of Defendants' violation of 18 U.S.C. § 1962(d).

13                              **COUNT IV**

14                           **Breach of Contract**

15       133.   Plaintiff repeats and re-avers each and every statement contained in Paragraphs 1

16  through 132 above.

17       134.   Plaintiff and other Class members entered into contracts with USF or its predecessors

18  under which CHW and other Class members purchased food and other products from USF pursuant to

19  a cost-plus contractual arrangement. CHW and other Class members complied with all of their

20  obligations under the contracts.

21       135.   The terms of these contracts provided that the price charged by USF to CHW and other

22  Class members was to be based on a cost component plus a distribution fee or mark-up. The

23  distribution fee was expressed as a percentage of the cost component or as a fixed dollar amount for

24  certain products. For certain products, these contracts calculate the cost component of the price

25  charged to USF's customers by using the invoice issued by USF's vendors or other similar types of

26  entities.

27       136.   USF repeatedly used invoice costs from the VASPs to calculate the cost component of

28  the price billed to its customers.

25

137.    The VASPs, or other entities operated in a substantially similar manner, are not the type of entity from which the contract permits USF to use an invoice to calculate the cost component of the price billed to its customers.

138.    USF did not have the discretion to use the invoice costs from the VASPs, or other entities operated in a substantially similar manner, to calculate the cost component of the price billed to its customers.

139.    USF breached the contracts with, and the reasonable expectations of, CHW and other Class members by using invoice costs from the VASPs, or other entities operated in a substantially similar manner, to calculate the cost component of the price billed to its customers.

140.    USF further breached the terms of its contracts with CHW and other Class members by acting dishonestly and in a commercially unreasonable manner to manipulate the invoice costs (as described in more detail above) used to calculate the cost component of the price charged to its customers.

141.    CHW and the Class were injured by having paid higher prices for the food and other products they purchased from USF than they otherwise would have paid had USF not breached its contracts.

**COUNT V**

**Fraudulent Inducement, Concealment and Nondisclosure by USF**

142.    Plaintiff repeats and re-avers each and every statement contained in Paragraphs 1 through 141 above.

143.    At no time prior to entering into contracts with Premier, CHW or other Class members, or during the course of such agreements, did USF ever fully disclose the creation, existence, use and exploitation of the VASPs. Although Royal Ahold partially disclosed the existence of the VASPs on October 16, 2003, such disclosures were misleading and incomplete, as described in Count VI below.

144.    USF had a duty to disclose such facts to CHW and other Class members, but instead actively concealed and suppressed certain material facts in order to represent that what it disclosed was the whole truth. By representing itself as a legitimate broadline food distributor, USF created the false impression that it would purchase goods only from bona fide manufacturers, wholesalers, suppliers,

26

COMPLAINT

and other food product purveyors with genuine business and economic substance, but intentionally concealed and/or did not disclose the fact that it interposed into the supply chain sham entities whose essential purpose was to defraud its customers. Also, USF represented to CHW and other Class members that it would retain the benefit of (and not pass through to its customers) certain promotional allowances or similar supplier incentives, but intentionally concealed and/or did not disclose its plan to create sham entities, and to falsely characterize the "buckets" of money it received from such sham entities as legitimate promotional allowances.

145.    USF knew CHW and other Class members were ignorant of such facts and did not have an equal opportunity to discover such facts.

146.    USF's concealment of and failure to disclose such facts constituted material misrepresentations. USF acted with malice, oppression or fraud.

147.    As a direct result of those misrepresentations, USF induced Premier (for the benefit of its members), CHW and other Class Members to enter into contracts with USF, place orders for products from USF and make payments to USF.

148.    USF intended Premier, CHW and other Class members to rely on the misrepresentations and to enter into contracts, place orders and make payments based on such misrepresentations.

149.    Premier, CHW and other Class members reasonably relied on USF's misrepresentations when they entered into contracts, placed orders and made payments to USF.

150.    As a result of being induced to enter into contracts, place orders and make payments for products from USF without knowledge of USF's creation, use and exploitation of the VASPs, CHW and other Class members were injured by having paid higher prices for the food and other products purchased from USF.

**COUNT VI**

**Fraudulent Inducement, Concealment and Nondisclosure by Royal Ahold**

151.    Plaintiff repeats and re-avers each and every statement contained in Paragraphs 1 through 150 above.

COMPLAINT

152.    Although Royal Ahold was aware of USF's VASP scheme prior to its purchase of USF, it concealed and failed to disclose the existence of the VASPs until October 16, 2003, when it made incomplete and misleading statements about the VASPs in its 2002 Form 20-F.

153.    In its 2002 Form 20-F, Royal Ahold stated that the VASPs "purchase[d] certain commodities and products from third parties" and resold such products to USF, claimed that the VASPs "provide varying degrees of support to USF primarily in the purchase of private label and signature brand products," and claimed that the purpose of USF's direct negotiations with suppliers who subsequently received "orders" from the VASPs was to "ensure price, product specifications and quality requirements."

154.    Such statements were false and misleading.  Royal Ahold made partial representations about the VASPs but at the same time intentionally suppressed and concealed the true purpose of the VASPs, *i.e.*, to falsely create a "spread" on the goods that USF sold to its customers, and "hide PA's [promotional allowances] from clients' auditors."  As a result of its actions, Royal Ahold had a duty to disclose such facts to CHW and other Class Members.

155.    Royal Ahold knew CHW and other Class members were ignorant of such facts and did not have an equal opportunity to discover such facts.

156.    Royal Ahold's misleading statements about the VASPs and its concealment of and failure to disclose the true nature and purpose of the VASPs constituted material misrepresentations. Royal Ahold acted with malice, oppression or fraud.

157.    As a direct result of those misrepresentations, Royal Ahold induced CHW and other Class Members to enter into contracts with its wholly-owned subsidiary, USF, to place orders for products from USF, and make payments to USF.

158.    Royal Ahold intended CHW and other Class members to rely on the misrepresentations and to enter into contracts, place orders and make payments based on such misrepresentations.

159.    CHW and other Class members reasonably relied on Royal Ahold's misrepresentations when they entered into contracts, placed orders and made payments to USF.

160.    As a result of being induced by Royal Ahold's misrepresentations to enter into contracts, place orders and make payments for products to USF, CHW and other Class members were

28

COMPLAINT

injured by having paid higher prices for the food and other products purchased from USF after such misrepresentations were made than they otherwise would have paid if Royal Ahold had been forthcoming in its statements.

## COUNT VII

**Violation of California Business and Professions Code §§ 17200 *et seq.*:  Against Defendants Royal Ahold, U.S. Foodservice, Redgate and Schofield for Unlawful, Unfair and Fraudulent Business Practices**

161.    Plaintiff repeats and re-avers each and every statement contained in Paragraphs 1 through 160 above.

162.    Defendants Royal Ahold, USF, Redgate, and Schofield have engaged in unlawful, unfair and fraudulent business acts or practices within the meaning of California Business & Professions Code §§ 17200 *et seq.* in connection with their illegal overcharge schemes, as described above. Defendants used these illegal overcharge schemes with the intent, directly or indirectly, to dispose of CHW and other California Class members' property through the use of falsely inflated invoices.

163.    To do so, Defendants engaged in unlawful business acts or practices within the meaning of California Business & Professions Code §§ 17200 *et seq.* by, as described above, conducting the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c); conspiring to conduct the affairs of an enterprise in violation of 18 U.S.C. 1962(d); violating the federal mail fraud statute, 18 U.S.C. § 1341; violating the federal wire fraud statute, 18 U.S.C. § 1343; and violating the federal money laundering statutes, 18 U.S.C. §§ 1956 and 1957.

164.    Further, Defendants engaged in unfair and fraudulent business acts or practices in violation of California Business & Professions Code §§ 17200 *et seq.* by, among other things, setting up shell companies, inventing sham transactions, and creating phony invoices used to bill CHW and other California Class members.

165.    These business acts or practices constituted a pattern of behavior that victimized CHW and other California Class members by deceiving them into believing that USF's cost component was calculated based on transactions with only legitimate suppliers.

29

COMPLAINT

166.    As a direct and foreseeable result of Defendants' violations, CHW and other California Class members suffered substantial monetary losses by having paid higher prices for the food and other products they purchased from USF.

## COUNT VIII

### Unjust Enrichment Against Defendant Royal Ahold

167.    Plaintiff repeats and re-avers each and every statement contained in Paragraphs 1 through 166 above.

168.    Royal Ahold knew about the existence, use, and execution of the VASP scheme.

169.    By guaranteeing certain obligations of the VASPs relating to purchases made on behalf of USF, Royal Ahold assisted USF in carrying out its VASP scheme.

170.    As a result of the acts alleged, Plaintiff and Class members paid inflated product prices for purchases from USF. The payment of these overcharges represents an unjust benefit the Plaintiff and Class members conferred upon Royal Ahold.

171.    Royal Ahold accepted and retained the proceeds of these illegal acts and thus, was unjustly enriched by these illegal overcharges. Equity requires disgorgement to prevent Royal Ahold from benefiting from the retention of the Plaintiff's and Class members' property.

172.    Plaintiff and Class members seek an order directing Royal Ahold to return the benefit Royal Ahold unjustly procured, received, and retained from the schemes alleged herein.

## COUNT IX

### Imposition of Constructive Trust Against Defendant Royal Ahold

173.    Plaintiff repeats and re-avers each and every statement contained in Paragraphs 1 through 172 above.

174.    The Court should impose a constructive trust on all monies, currency, profits, negotiable instruments, promissory notes and interests in property, both real and personal, which Royal Ahold acquired as a result of the schemes described herein, including but not limited to any proceeds Royal Ahold receives from its sale of USF. Royal Ahold holds Plaintiff and Class members' funds as a constructive trustee for the benefit of Plaintiff and Class members.

COMPLAINT

175.    Plaintiff and Class members are unaware of the total amount of funds attributable to the VASP and promotional allowance schemes Royal Ahold currently holds.  However, these amounts are traceable to the transactions in which Plaintiff and Class members were overcharged for purchases from USF.

**PRAYER FOR RELIEF**

WHEREFORE, Catholic Healthcare West, on behalf of itself and the Class, respectfully prays for a judgment against Defendants, jointly and severally, as follows:

(i)    Determining that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23, be given to the Class;

(ii)    As to all Counts, damages in an amount to be determined at trial;

(iii)    As to Counts I to III, trebling of damages;

(iv)    As to Counts I to III, disgorgement;

(v)    As to Counts I to III, injunctive relief preventing Defendants from violating the RICO statute;

(vi)    As to Counts I to III, the costs, expenses, and fees, including reasonable attorneys' fees, of prosecuting this action;

(vii)    As to Counts V and VI, exemplary or punitive damages for Defendants' intentional, willful or malicious misconduct;

(viii)    As to Count VII, for restitution and disgorgement of monies pursuant to the California Business and Professions Code;

(ix)    As to Count VIII, for restitution and disgorgement; and

(x)    As to Count IX, for imposition of a Constructive Trust.

Such further relief that may be granted in the interests of justice.

Plaintiffs hereby demand a trial by jury on all issues so triable.

31

COMPLAINT

1

2  Dated: *August 17, 2007*

AKIN GUMP STRAUSS HAUER & FELD LLP
Steven Kaufhold

3

4

By *Steven Kaufhold, Jr.*

5

6  R. Laurence Macon (*pro hac vice* to be filed)     Richard L. Wyatt, Jr. (*pro hac vice* to be filed)
7  Karen Kroesche Gulde (*pro hac vice* to be filed)   Todd M. Stenerson (*pro hac vice* to be filed)
   **Akin Gump Strauss Hauer & Feld LLP**             **Akin Gump Strauss Hauer & Feld LLP**
8  300 Convent Street, Suite 1600                      Robert S. Strauss Building
   San Antonio, Texas 78205                            1333 New Hampshire Ave., N.W.
9  Telephone: (210) 281-7000                           Washington, D.C. 20036-1564
   Facsimile: (210) 224-2035                           Telephone: (202) 887-4000
10 lmacon@akingump.com                                 Facsimile: (202) 887-4288
   kgulde@akingump.com                                 rwyatt@akingump.com
11                                                     tstenerson@akingump.com

12

13 Gordon Ball (*pro hac vice* to be filed)
   **Ball & Scott**
14 550 West Main Street, Suite 601
15 Knoxville, Tennessee 37902
   Telephone: (865) 525-7028
16 Facsimile: (865) 525-4679
   gball@ballandscott.com
17

18 Attorneys for Catholic Healthcare West

19

20

21

22

23

24

25

26

27

28

COMPLAINT

# Exhibit 1

```
Author: Paul.Ekelschot@corp.ahold.nl at Internet-USA
Date:   2/20/2000  6:01 PM
Normal
TO: Cees-van-der.Hoeven@corp.ahold.nl at Internet-USA,
    Jan.Andreae@corp.ahold.nl at Internet-USA, Michiel.Meurs@corp.ahold.nl at Internet-USA,
    Allan.Noddle@corp.ahold.nl at Internet-USA, Robert.Tobin@corp.ahold.nl at Internet-USA
CC: Jan-Wytze-van.Boven@corp.ahold.nl at Internet-USA,
    Ton-van.Tielraden@corp.ahold.nl at Internet-USA,
    Andre.Buitenhuis@corp.ahold.nl at Internet-USA,
    Ernie.Smith@corp.ahold.nl at Internet-USA, Bert.Verhelst@corp.ahold.nl at Internet-USA,
    Carol.Greczner@corp.ahold.nl at Internet-USA, David Herskovits at DTT.US.ATLANTA,
    Bettina.Schenk@corp.ahold.nl at Internet-USA,
    Inge.Plooijer@corp.ahold.nl at Internet-USA,
    Secretariaat_JG_Andreae@corp.ahold.nl at Internet-USA
Subject: Limited Due diligence Snow
-------------------------------- Message Contents
```

Last week a limited DDA has been performed on Snow, consisting of a review of documents prepared by Snow in a document room, a review of the workpapers of Snow's auditors KPMG and a discussion with Snow management.
We concentrated on financial and tax issues. HR and benefit plans have been reviewed by Gary Preston and Jim McDonald, however, their conclusions are at this moment not yet available. A legal due diligence has been performed by White&Case staff; although no formal report has been issued yet we have been informed that no issues have been revealed.

Our findings are that at this moment no conditions exist requiring further examination of this acquisition or to stop the acquisition process. However, there are several items of which we think you should be aware of, requiring future adjustments or prone to future P&L charges. We advise to perform a full due diligence after acquisition although that may require a very material effort.

1. Promotional Allowances.
The company is heavily dependant on promotional allowances from vendors; on a net result in fiscal 1999 of $83 million the company received $350 million in the form of PA. Management believes to be able to maintain and to improve the level of rebates from vendors by ½ to 1 % over the next year.
However, the company's systems to record allowances to be received are weak; the company in fact relies heavily on the vendor to establish the billing. The company doesnot maintain a proper system of deal sheets to fix the receivable on its own. The situation can easily result in losses and in frauds. There seems to be a large opportunity to recover missed deal moneys through improved systems and third party audits (note that in 2000, the company expects over $400 million in rebates).

The company doesnot pass PA to its clients of which many have a cost plus contract. The Company uses brokers for its private label programs in order to shelter and earn similar ?rebates? on its private label brands and to hide PA's from clients' auditors. According to management there is no risk involved in this situation. This technique needs to be researched to assess the tax and legal implications and associated business risks.

While the company's rebates represent approximately 7% of purchases, the carrying value of inventory is only reduced by 3% for such rebates. The Company maintains that this practice is historically consistent and that a portion of rebates represents reimbursement for periodic trade shows and advertising; however, no data or analysis appears to be available to support the methodology and the impression exists that a further - one time charge to P&L could be required up to approx. $10 million.

2. IT-systems.
An important effort has to be made to overhaul the IT systems which are not up to standard and not integrated. The cost involved should be established on short notice. Consolidation is still done on a spreadsheet application.
The Company operates on multiple (approximately 10) legacy IT platforms amongst its 40 divisions. Because of the estimated cost involved, the company considers not to be able to ?commonize? or centralize these platforms. A previous strategy to put all divisions on common systems has been revised two times in the last 2 years: First, the company began the rollout of the TDS distributed systems but abandoned that after 6 divisions were on it as it was not as ?robust? as desired, and; after that a plan to put all divisions on the mainframe systems was stopped in November 99. The software costs related to TDS

Confidential Treatment Requested by Deloitte & Touche, LLP

DT-USF0098064

* In 1999 the company's Accounts Payable system collapsed resulting in double and triple payments to vendors

* The company plans to focus its IT resources on implementation of the following in priority order: a common sales and order entry system, Next Day Gourmet Internet shopping and a new AP system integrated with purchasing. This is considered to have the biggest impact on the business as they provide value to customers, improve sales force functions and cash flow. Management also described ongoing IT initiatives to customize and integrate their sales systems with the customers? ordering process, thereby ?hooking? the customer and making it more difficult for them to change suppliers.

3. Accounting.
Although the CFO considers that the company is in the ?middle? range of conservatism in accounting policies and more conservative than its competitors and the companies acquired we have the opinion that the company seems to avoid P&L charges where possible. Reserves seem to be maintained at the low end of a reasonable range. As examples we found;
  While the company's rebates represent approximately 7% of purchases, the carrying value of inventory is only reduced by 3% for such rebates (see above).
  Approximately $15 million of software costs have been capitalized for systems which do not appear to have full value.
  The computation of the reserve for doubtful accounts provides a reserve of 25% for accounts over 90 days past due and 50% for accounts over 1 year past due. KPMG noted that they were under reserved for customer AR by $2.0 million.
  The Company appears to defer (particularly in prepaids and probably in PP&E) any cost which might qualify for deferral.
  The Company records no accrual for vacation pay as it maintains that it utilizes a ?use it or lose it? vacation policy. We were told this policy is not maintained consistently across all divisions.
  The Company does not expense the portion of its matching contributions to its 401K plan which it anticipates will be forfeited (due to turnover) in the future. If forfeitures cannot be returned to the company under the plan, this methodology may not be acceptable under US GAAP.
  The company maintains that all divisions are profitable and that no ?impairment issues? exist. We did note that the San Francisco division closed this month has been producing losses for quite some time ? no impairment charge was taken in the past as the company believed it could make this operation profitable.
  In addition, no goodwill has been written off when certain divisions with associated goodwill were closed. Restructuring reserves principally are for leases on idle facilities. Rent for one facility, which is being used but ?below 50% capacity,? is being charge partially to P&L and partially to this reserve.
KPMG ultimately ?passed? adjustments which would have reduced income by over 2%. However, numerous differences were ?passed? on individual workpapers and not brought forward to the final passed adjustment worksheet.

The intercompany balance sheet accounts are currently unreconciled (they, in fact, have not been reconciled in quite some time in spite of the Company?s acquisition activity) ? the out of balance condition is approximately $8 million. Furthermore, intercompany transactions (sales and cost of sales) are not eliminated as they are not believed to be material.

4. Control
Each of the 40 divisions has its own accounting department led by a ?divisional controller.? The divisional controllers participate in regional conference calls ? no ?all hands? divisional controller meeting has been held for several years. No accounting manual has been developed ? the company does maintain certain ?standards? for computation of bad debt reserves and inventory reserves at the division level. This situation could result in many different interpretations of accounting issues. While an internal audit function exists, it is small and focuses on a limited scope.

The CFO states that control over the financial activities at the divisions is achieved through three processes, which are centralized or mostly centralized: treasury, payroll and disbursements. Customer payments are directed to lock boxes, division cash accounts are swept up to a central account and their disbursements are funded through the central treasury function. Payroll is input by location, but reviewed and paid out of a corporate HR function. Purchasing and disbursements for approximately 45% of purchasing is done centrally (15 divisions on mainframe plus private label purchasing).

Confidential Treatment Requested by Deloitte & Touche, LLP                                      DT-USP0098065

KPMG reviews on a rotation basis about 60% of the activity and spends 3000-4000 hours on this audit.

5. Self-Insurance.
The company is self-insured for worker's compensation, auto and general liability matters. The company has almost no reserve for general liability claims. The total reserve (approx. $11 million) has been established based on case reviews by the administrator factored for experience and discounted at 8%. The computation at June 1999 excluded claims incurred after March 31 of the current year. No actuarial review has been performed. Further, it is not clear what controls exist to assure that all claims have been considered by the administrator. The CFO states that the claim handler Kemper is very conservative in estimating claims. We consider that an actuarial calculation has to be made as soon as possible.

No consideration appears to have been given to any liability for ?second injury fund? matters (under SOP 97-3).

6. Tax matters. (prepared by Mike Maxey and Joel Ihrig)
The tax returns for the years June 1997, December 1997, (short period return necessitated by the Rykoff-Sexton merger) and June 1998 were reviewed. The tax return work papers were not made available. The return for the year-ended June 1999 has not yet been filed. State income tax returns were not made available.

_ IRS examination - The examinations through the year 1993 are settled except for a relatively minor depreciation issue. Examinations for 1994 and 1995 have recently started and no significant issues have been identified. David Einhorn informs us that subsequent to 1995 the company is considered a large case audit. These years will be examined but examination has not been scheduled.

_ Snow's corporate tax structure is relatively complicated because of the significant number of legal entities (50+) and a significant number of locations (40 + states) in which business is conducted. The structure has evolved through numerous acquisitions, operational reasons for certain entities, and state tax planning techniques. The company does have plans to make the structure more efficient through a combination of certain entities.

_ The company has transacted numerous acquisitions most of which have been relatively small. In December, 1997, Rykoff-Sexton was acquired through a tax free merger. Rykoff-Sexton stockholders as a result of the merger owned slightly greater than 50% of the merged entities. Thus, the existing tax consolidated group is a continuation of the former Rykoff-Sexton group. The merger was tax free.

_ The companies have approximately 21 million of federal net operating loss carry forwards after the year-ended June 1999. Other losses were used either in the June 1999 returns or were carried back to prior years.
The companies have significant state net operating loss carry forwards (200 + million). The use of some of these losses are limited by the jurisdictions in which the losses were generated or the ability of certain entities to generate profits. After considering these limitations, it
appears the value of the state net operating losses to be used subsequent to June 1999 is 15 - 18 million dollars. We do not have information to indicate how much of these losses may have been used by Snow prior to the date of the Ahold acquisition. The ability to use the loss could be affected by Ahold strategies implemented

_ As of June 1999, Snow had approximately 21 million dollars in tax reserves. The reserve has been established for the following purposes:

- State income tax planning reserves - 6.7 million
- Miscellaneous items 1.8 million
- Interest expense on potential tax assessments - 3.2 million
- Golden parachute issue resulting from Rykoff-Sexton merger - 3.0 million
- Unspecified cushion and valuation allowances - 6.5 million

The Golden Parachute (Section 280 G) issue results from the Rykoff-Sexton merger. Based on the stock ownership after the merger, there was not a change in the control of Rykoff-Sexton because its shareholders had more than 50% subsequent to the merger. The amount was

Confidential Treatment Requested by Deloitte & Touche, LLP

DT-USF0098066

evaluated the situation and believe that it is likely the company will not incur this potential tax expense.

Based on the information made available and the discussions with the KPMG tax partner, we did not identify any other material items for which cushion should be established. Although more in depth analysis and due diligence would be needed, it appears the tax cushions are sufficient.

_    According to the 10K there were 4,376,000 options outstanding in July 1999. The average exercise price was $15.74. Pursuant to the 10K, upon a change of control of the company all outstanding and previously unvested options will become immediately exerciseable. Assuming the options are cashed out upon a change of control, a tax deduction should be generated for the difference between the deal price and $15.74 per share.

_    Inventory - A small amount (less than 10%) of the companies inventories are on the LIFO inventory method. Presumably this is because the company did not want earnings reduced by the LIFO method. The reserve is approximately $7 million or less. After acquisition, Ahold should consider adopting the LIFO methodology. With its inventory levels at approximately $500,000,000, the annual taxable income reduction because of the LIFO method would be approximately $5,000,000 for each 1% of inflation.

_    The tax/book reconciliation schedule identifies approximately $14,000,000 of workers compensation reserves not deducted. These amounts could potentially be insured through Ahold?s captive. Other potential self-insured items are not reflected on the book tax difference schedules.

_    The company projects increasing income in the coming years. Ahold will eliminate a significant portion of this federal taxable income through finance charges. One of our objectives was to identify the companies which are most likely to create the state taxable income so that the finance charges will be absorbed in an entity that will generate state tax benefit. Based on a review of current operating results and discussions with the tax advisor, it appears the entities that would potentially generate significant state taxable income in the future would be J. P. Food Service Distributors, Inc., Biggers Brothers, Inc., John Sexton and Company, US Food Service, Inc., and Illinois Fruit and Produce Corporation.

_    We questioned the tax advisors as to whether any tax planning strategies had been implemented or which tax opinions had been rendered. We were advised that none exist.

_    Alternative minimum tax - The company has not had significant differences in computing income for regular tax and alternative tax. Therefore alternative minimum tax has not been an issue.

_    Golden Parachute (Section 280 (G)) - The proxy discusses employment agreements for certain executives under which amounts may be payable upon change in control. Some of these payments could potentially result in disallowed deductions pursuit to the Golden Parachute provisions. Also, excise tax could be imposed on the individuals and the company is committed to reimbursing the executive under these contracts for that excise tax. We did not have information to analyze the Parachute situation. It is mentioned here for the purpose of awareness.

_    The tax law (Section 162 (m)) disallows compensation for ?excessive employee remuneration?. This disallowance applies to certain types of compensation when the employee's compensation exceeds $1,000,000. This provision does not apply if the compensation amounts meet certain performance based criteria. Also, certain amounts can be grandfathered from this provision depending on when the contract was made. We were not given any information analyzing the applicability of Section 162 (m) to those executives making in excess of $1,000,000. KPMG said that this issue is monitored by the company.

7. Benefit plans.
Results of the review to be reported ultimately.

8. Due diligences.
The company went through a large number of acquisition processes the last couple of years. Although we have seen for two recent acquisitions the documents collected by the company we couldnot conclude that a comprehensive and

acquisition were not made available to us.

**9. Other**
The Webb acquisition requires future payments (which could aggregate $30 million) based on that division's future performance. Apparently, approximately half of those payments would be made to the former owners (who do not work in the business) and would therefore be recorded as additional goodwill; the remainder would be paid as bonuses to management and should be charged to P&L.

The Company entered into a swap arrangement (known as ?SwapOption?) last year which fixed the interest rate (at 8+%) on a portion of its revolving line. The motivation appeared to be to avoid a one time charge which would be required to redeem certain notes ? instead this charge is in effect being amortized over the life of the swap arrangement.

The Company sold its manufacturing operations a couple of years ago for cash and notes. The gain realized ($57M at June 1999) is being amortized over the life of the related supply agreement entered into with the buyer of the manufacturing business.

# Exhibit 2

To: Michiel Meurs

From: Ernie Smith

Re: U.S. Food Service

April 12, 2001

It is with reservation that I bring the following matters to the board of Royal Ahold. I am Ernie Smith. I know many of you from my many years of being a loyal executive with Royal Ahold. As of this week, I am no longer with the organization. I wish to bring the following matters to the attention of the board as part of my fiduciary responsibility as the financial officer of U.S. Food Service and as the prior financial officer of Ahold USA. I have the following concerns related to the acquisition and operation of U.S. Food Service:

Management Awards - We acquired USF in April of 2000. After the acquisition was completed there was a conversation with me concerning paying the USF executive committee a make whole on the stock price. Ahold tendered $26 per share for the outstanding shares of the company and correspondingly took the company off of the market. The payment would make the management of USF whole for $30 per share. The make whole was for $4 a share and is in the approximate value of $10 million, a little more than half of which was to the CEO of USF, Jim Miller. I located a document in Jan/Feb of this year, which placed these discussions during the acquisition. This transaction is a S.E.C. violation and exposes Ahold to a potential shareholder suit.

Financial Records - The condition of the financial records of USF have made it difficult to assemble a credible view of the earnings potential of the company. During the initial due diligence of this public company, the due diligence team found the records of the company to be in disarray. Since the acquisition we have made many purchase accounting adjustments to the opening balance sheet. The balance sheet of USF I believe to be relatively clean today. However the volume of adjustments are between $250 to $350 million on an asset base of approximately $2 billion and nearly represents a total years cash flow.

The volume of adjustments and type of adjustments cause me significant concern for Royal Ahold. As you are aware the company was a publicly traded company and large adjustments to past income recognition other than changes in accounting principles or Ahold standards should not occur. The previous auditors of USF and USF management have significant exposure as it relates to the condition of the financial records. In USF there has been well over $150 million of adjustments to prior reported income. While the adjustments are appropriate from an opening balance sheet perspective, they are not appropriate from a public accounting or SEC perspective and create much concern as to the earnings potential for USF. Earnings have been manipulated by overstating allowance income, the United Signature contract and value added service providers.

It is my belief that the earnings potential for USF has been materially overstated and the addition of new large acquisitions is an attempt to mask the short fall.

ES 10001

☑ oo

Current environment – The earnings have been short since the beginning of the year by about $8 to $10 million monthly due to a gross profit issue and have been made up with balance sheet and favorable expenses. The gross issue shows little sign of improving and is in the magnitude of 40 to 70 basis points of sales. In addition allowances have been booked at a historical rate, which approximates 4.5%. Remember the historical run rate of 4.5% includes all of the overstated income adjustments, which have been reflected in purchase accounting. Also the mix of street customers to chain customers is materially negative to plan in the USF divisions. Street customers drive the allowance income while chain customers have little allowance income. There is a tremendous amount of pressure to book allowances with no support to make the earnings targets. This in my view is unacceptable and will expose Ahold to potential liability from our shareholders.

Allowance tracking was to be set up early in the year and as of today little has actually been completed. Allowance tracking would track by manufacturer by item the amount of allowance income to be recognized on a period basis. I have had open resistance to setting up this program since January. Unfortunately PYA who had good control over this process is now slipping into the USF bucket method of accounting. USF is to deliver $592 million in corporate allowance income for the year. As of April less than $50 million has been billed or collected while we have recognized $125 million in income. This may materialize but I am sure you understand my discomfort with the lack of movement on this issue.

Business Plan – There is no business plan for USF. The company is managed by numerous conversations, often-closed door without a factual review. There is very limited acquisition integration even though acquisitions are a corner stone for growth. The environment is confused with inconsistent direction.

In summary I have great respect for the management team of Ahold. Ahold is and has been a reputable company with high integrity. I took on the U.S. Food Service assignment with the attitude that I needed to clean up many past financial practices. I realize that there was much work to be done and it would take approximately two years if I had the full support of management. It became apparent that management was not as eager to have the financial records of the company at an acceptable Ahold level and that the team lacks integrity. Therefore I felt I had no alternative other than to exit the business and disclose the issues.

If I can be of further service to Ahold please feel free to call. My home number is 540 882 4146. It has been a pleasure serving with the Ahold family. I have attached additional thoughts on related issues to supplement the broad comments above.

Supplemental Discussion Attached

ES 10002

## Supplemental Discussion

Income Adjustments – Prior reported income for USF has been adjusted by $60 million by USF management prior to Ahold buying them but after the deal was announced. This was done with no conversation with Ahold. Another $30 million was adjusted for the All Star promotion which never materialized and was to be a timing adjustment. Another $45 million was adjusted to a change in the revenue recognition policy, which I supported and proposed. United Signature Food unearned income was being recognized as income even though the contract was negative. The penalties for the contract were being recorded to the balance sheet. The United Signature contract alone resulted in pretax earnings being overstated by penalties being misreported by $20 million +- and income being recognized annually for a previously booked unrealized gain of $12 million ($32 million). There were numerous receivable balances on the balance sheet, which were not supported and were written off and continue to arise even a year after acquisition. These are in the range of $20 million and often relate to allowances.

I want to make certain that the implication of these adjustments is understood. Management was aware of the adjustments and the need for them at the time of the acquisition. Ahold bought the company based upon cash flow and earnings potential. The earnings had been misstated to support a higher stock price and a higher buy out price from Ahold. Had earnings in the past year been properly stated the price for the company would have been lower by as much as 20 to 30 percent or approximately $1 billion. Some of these issues were disclosed during the process but many of them were not. Disclosed or not the shareholders of Ahold paid for something they did not receive and were deceived by management.

United Signature - This is a contract for the sale of an entity acquired by USF through a merger in 1997 with Rykoff Sexton. The sale of the manufacturing operations resulted in a supply agreement and sale of assets to Kohlberg. The sales price was approximately $101 million of which USF retained a note of $16 million (net proceeds of $85). I have recently negotiated a settlement with Kohlberg in the amount of $98 million plus the forgiveness of the USF note to rid USF of the contract. The shortfall penalties associated with the contract have been running approximately $2.5 million per month and have a remaining contract net present value of $88 million plus the penalties for a separate detergent agreement that currently has a net present value of $36 million. In addition to these penalties there is lost income for USF of approximately $10 to $15 million per year in unfavorable cost of product. In addition there is unearned income, which has been recognized since the inception of the sale of United Signature. As you can see this is a terrible contract for Ahold/USF. I have tried to understand a rational explanation for entering into a sale agreement, which is so extremely unfavorable for USF. What concerns me about this situation is not that the company entered into a bad contract but the accounting transaction recognized substantial income (between 1998 and 2001) during the time frame up until the acquisition by Ahold and the earnings of USF have been materially misstated. The transaction could have been used in an attempt to bridge earnings shortfalls from the point of the Rykoff acquisition until the company could be sold?

ES 10003

Third Party Transactions -- In the normal course of business, USF has engaged in setting up friendly third parties, which allow them to establish pads to income. In substance a new legal entity is set up, the entity will take title to goods; mark them up and sale the product to USF. In turn by contract, the third party will collect a fee for the service and return to USF allowances. It has been common practice for USF to have these entities forward buy and USF to give them a deposit for inventory. In theory I believe the process to be understandable and logical for the food service industry where the creation of inside margin is normal. The concern over these activities relates to the poor procedures and the ability to manipulate income. There are four major value added service providers (vasps). During due diligence we were unaware of contingent liabilities related to vasps. One of the activities, which we were tightening up, was to put in a process where by the income differentials by purchase order between the vasp and the USF divisions would be accounted for on a period basis. In addition we were automating and centralizing the payment of the invoices for the vasps. The funding for forward buys was to be trued up on a period basis. While working through this, one of the items which came to light was a past due balance that is in excess of $20 million and was known by management and not reflected in the financial statements of the company and not disclosed during any of the audit confirmations. We took a purchase accounting reserve for these items. It was suggested that these funds could be made available for income recognition during this year should a reserve be established. I am unaware the vasps are holding funds to cover this and did not have an opportunity to review the status of the vasps as it relates to this issue. I had scheduled a review of the vasps to be conducted by internal audit and the audit should begin in the next couple of weeks.

If you should have any questions or would like to discuss my views on any of these issues please let me know.

ES 10004