# Exhibit A

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

Waterbury Hospital, Cason, Inc., and Frankie's Franchise Systems Inc., on behalf of themselves and others similarly situated,

                *Plaintiffs*,

        v.

U.S. Foodservice, Inc.,

                *Defendant*

      :
      :
      :    CIVIL ACTION NO.
      :    3:06-CV-1657 (CFD)
      :
      :
      :
      :
      :
      :
      :
      :    <u>JURY TRIAL DEMANDED</u>

## <u>AMENDED CLASS ACTION COMPLAINT</u>

Pursuant to the Court's October 19, 2006 Order on Pretrial Deadlines, plaintiffs Waterbury Hospital, Cason, Inc., and Frankie's Franchise Systems Inc. ("plaintiffs"), by their attorneys, bring this individual and class action pursuant to Rule 23 of the Federal Rules of Civil Procedure against U.S. Foodservice, Inc. ("USF") for violations of 18 U.S.C. §1962(c) and breach of contract, and allege the following upon information and belief, except as to those paragraphs pertaining to plaintiffs' own actions, which are alleged upon personal knowledge. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery:

## <u>NATURE OF ACTION</u>

1.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on their own behalf and on behalf of a class (the "Class") of similarly situated entities and

individuals that purchased products from USF or any of its subsidiaries pursuant to cost-plus agreements and were overcharged as a result of USF having artificially inflated its stated cost of goods sold.

2.    The case involves a scheme whereby USF, the second largest food distributor in the United States, fraudulently inflated the prices it charged to their cost-plus customers. USF was able to inflate said invoice prices by getting its internal and external food purchasers to provide USF with fraudulent invoices. Said invoices were used for the sole purpose of increasing USF's reported cost of goods acquired and thereby increasing USF's profit margins. USF purchased the food products it re-sold through either Product Managers, who were employees of USF, or through "VASPs," which were purportedly third party companies, but which were controlled by USF.

3.    Pursuant to this scheme, USF would sell to its customers, such as plaintiffs and the other members of the class, foodservice products on a "cost-plus" basis (hereinafter "Cost Plus Customers"). Under these "cost-plus" arrangements, the prices that USF was supposed to charge its customers was the amount USF actually paid for a particular product plus a fixed percentage added on to that amount.

4.    In order to increase its operating and profit margins above what it was entitled to under its agreements with its Cost Plus Customers, USF would enter into secret agreements with suppliers pursuant to which the suppliers would mark up the actual costs reflected on their invoices to USF, above what USF would have otherwise paid for the products. Suppliers are entities who sold food products to USF through Product Managers and/or VASPs. After receiving payment from USF, however, the suppliers and/or VASPs would kick back to USF the difference between the

marked-up price and the actual price that the supplier otherwise would have charged absent the secret agreement. Nevertheless, USF would use the marked-up price as its stated actual cost, which USF would then add a specified percentage on top of, as provided for with respect to its cost-plus agreements, in order to arrive at the amount billed to the customers.

5.     In fact, USF would provide annual quotas to a number of its Product Managers responsible for purchasing food products from suppliers setting the amount of kickbacks they were expected to receive from the suppliers from the use of artificially inflated invoices. These amounts were referred to as "buying income." The USF Product Managers would be paid bonuses based on whether they achieved a sufficient amount of "buying income" for the year.

6.     In other instances the food products were purchased through VASPs who would then resell the products to USF at a marked up price. Pursuant to secret agreements with the VASPs, however, after receiving payment from USF, the VASPs would kick back to USF the difference between the marked-up price and the price the VASP paid for the product. Nevertheless, USF would use the marked-up price as its stated actual cost, which USF would then add a specified percentage on top of, as provided for with respect to its cost-plus agreements, in order to arrive at the amount billed to the customers.

7.     As a result of all of the foregoing, USF was able to fraudulently and unlawfully overcharge its Cost Plus Customers hundreds of millions of dollars in violation of federal law and the terms of its cost-plus agreements.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. §§1961, 1962, 1964, 28 U.S.C. §§1331 and 1367. The Court has personal jurisdiction over Defendant pursuant to 18 U.S.C. §1965(b) and (d).

9.    This Court is a proper venue for this action pursuant to 18 U.S.C. §1965(a) and 28 U.S.C. §1391(b).

## PARTIES

10.    Plaintiff Waterbury Hospital is a public hospital located in Waterbury, Connecticut. As part of its operations, Waterbury Hospital offers meals and other foodservices to its patients, employees and visitors. Waterbury Hospital is a party to a cost-plus buying agreement originally entered into with Alliant Exchange, which was acquired by USF in 2001. Following the acquisition of Alliant Exchange, Waterbury Hospital continued to purchase products from USF pursuant to its cost-plus agreement. On information and belief, USF wrongfully has overcharged Waterbury Hospital for a portion of the products it purchased from USF on a "cost-plus" basis as a result of the fraudulent scheme alleged herein. As result, Waterbury Hospital has been injured in its business and property.

11.    Plaintiff Cason, Inc. is an Illinois corporation located in Rockford, Illinois. Cason has operated a family-owned restaurant under the name Maria's Italian Cafe since the early 1960s. Cason has purchased products on a "cost-plus" basis from USF. On information and belief, USF wrongfully has overcharged Cason for a portion of the products it purchased from USF on a "cost-plus" basis as a result of the fraudulent scheme alleged herein. As result, Cason has been injured in

- 4 -

its business and property.

12.    Plaintiff Frankie's Franchise Systems Inc. ("Frankie's") is a Connecticut corporation located in Waterbury, Connecticut. Frankie's operates a chain of franchised restaurants in the State of Connecticut, including Frankies of Naugatuck, Frankies of Bristol, Frankies of West Haven, Frankies of Reidville, Frankies Dairyette, Inc., Frankies Lakewood Road, Ballpark Frankies, Frankies By The Sea, and Big Franks. Frankie's is a party to a cost-plus agreement with USF, pursuant to which Frankie's and its franchisees have purchased products from USF on a cost-plus basis. On information and belief, USF wrongfully has overcharged Frankie's for a portion of the products purchased from USF on a "cost-plus" basis as a result of the fraudulent scheme alleged herein. As result, Frankie's has been injured in its business and property.

13.    Defendant U.S. Foodservice, Inc. is based in Maryland with its principal offices located at 9755 Patuxent Woods Drive, Columbia, Maryland 21046. USF describes itself as one of the leading broad line foodservice distributors in the United States, with yearly revenues exceeding $18 billion. USF is a wholly-owned subsidiary of Koninklijke Ahold, N.V. (a/k/a Royal Ahold, N.V.) ("Royal Ahold"). Royal Ahold in based in The Netherlands and owns a number of supermarket and foodservice companies located in the United States and throughout the world. Royal Ahold acquired USF on April 10, 2000.

14.    Following its acquisition by Royal Ahold, USF substantially expanded its operations through a series of acquisitions of other foodservice distribution companies, including: GFG Foodservice, Inc., acquired in July 2000; PYA/Monarch, Inc., acquired in December 2000; Parkway Food Service, acquired in February 2001; Mutual Wholesale Co., acquired in May 2001; Alliant

Exchange, acquired in November 2001; Lady Baltimore Foods, acquired in December 2002; and Allen Foods, acquired in December 2002.

## SUBSTANTIVE ALLEGATIONS

### USF's Business and Cost-Plus Agreements

15.    USF supplies food and related products to over 300,000 foodservice customers, including small independently owned restaurants, chain restaurants (including national and regional chains), heathcare providers, governmental entities, educational institutions and other foodservice establishments. USF's operations cover over 95% of the geographic area of the United States.

16.    USF markets a wide variety of foodservice products to its customers, including meat, seafood, produce, dairy, frozen foods and other private label and brand name items. USF purchases these products from suppliers with which it has entered into supply contracts, and then re-sells the products to USF's customers. Between 2000 and 2005, USF generated revenues of between $7 billion and $18 billion, based largely on these sales.

17.    The cost of the products that USF purchases to resell to its customers are subject to significant fluctuation. In some instances, USF enters into agreements with its suppliers that lock in prices for a fixed period of time. Often, however, USF renegotiates prices with its venders on a regular basis, which in turn impacts USF's cost of sales to its end customers.

18.    In order to protect its profit margins against inflation and the regular occurrence of price fluctuations, USF often enters into what is known as "cost-plus" agreements with its customers. Cost-plus agreements allow USF to charge its customers the actual cost that USF paid for a particular product plus a fixed percentage added on to the cost.

- 6 -

19.    A substantial amount of USF's sales are made pursuant to cost-plus agreements. Indeed, a Royal Ahold spokesman stated in a Wall Street Journal article that approximately half of USF's sales are made to customers who purchase products pursuant to cost-plus agreements. Moreover, cost-plus agreements are particularly prevalent with USF's regional and smaller customers who do not have the type of buying leverage to negotiate fixed prices.

20.    By entering into these cost-plus agreements, USF is able to guarantee its operating margin rates on all of its sales. At the same time, however, such agreements serve to cap the margins USF receives on sales regardless of any favorable prices it is able to negotiate with its suppliers.

21.    In order to allow USF to retain the benefits achieved as a result of its relationships with its suppliers and the volume of products it purchased, USF's cost-plus contracts provide that certain contingent payments and other incentives USF receives from its suppliers will not be used to offset the cost used to calculate the amounts charged under the agreements, even though such amounts have the affect of reducing USF's actual costs. These payments are known as "promotional allowances" and consist of things such as volume contingencies, growth contingencies, marketing allowances and event-specific incentives, all of which are dependent upon USF achieving certain distribution targets and/or providing some sort of benefit to the suppliers. The cost-plus contracts, however, provide that customers are entitled to the benefit of any straight discounts from the suppliers on particular items, as reflected on the invoices.

22.    USF's cost-plus agreements contain the same or substantially the same terms regarding the manner in which USF will sell and price its products. In general, these agreements provide that USF will sell to the customers certain types of products in amounts and at times

- 7 -

specified by the customers.  The agreements further provide that the prices to be paid by the customers will be based on the actual costs that USF paid for the products.

23.    Specifically, the cost-plus agreements provide that the price charged by USF to the customer will equal USF's actual invoice cost plus an agreed upon percentage set forth in the agreement.  The agreed upon percentage above the actual invoice cost represents USF's negotiated profit.  In this regard, the pricing terms of a typical cost-plus contract provides as follows:

> The price of product to Customer shall equal USF's invoice cost (as hereinafter defined) plus the agreed upon fee per case on cost as outlined below.  USF's invoice cost is defined as the manufacturer's (supplier, packer or any other vendor) delivered cost or f.o.b. unit price plus standard freight (as hereinafter defined) to USF's distribution center, less off-invoice discounts or off-invoice allowances (such off-invoice discounts or off-invoice allowances to mean manufacturer generated discounts or allowances on particular items for set periods of time and which are specifically reflected on the invoice).  Invoice cost shall not be adjusted for, and Customer shall not be entitled to, promotional allowances, cash discounts, prompt pay discounts, growth programs or any other supplier incentives received by USF.

24.    Similarly, in other agreements, USF would represents that it will charge its cost-plus customers an amount equal to the "local market replacement cost or current market average cost of procured products" plus in-bound freight and an agreed upon mark-up percentage.  These agreements also provide that USF is entitled to retain "promotional allowances," as well as "cash discounts and other supplier incentives" received from vendors.

25.    Regardless of the precise language used, the material pricing terms of a USF cost-plus agreement provide that the prices charged by USF would be limited to the actual cost paid by USF for the product or its replacement cost without taking into account any promotional allowances to be received by USF from the supplier, plus the agreed upon percentage.

26.    USF's cost-plus agreements sometimes also provide that customers have limited

- 8 -

rights to examine documentation supporting USF's pricing.

27.    Products sold to USF's customers pursuant to cost-plus agreements would be invoiced by USF at rates that were intended to reflect the pricing terms contained in the agreements, which were supposed to be based upon USF's actual costs. In this regard, invoices would typically state that USF's "product cost" does not reflect adjustment for "promotional allowance" and other incentive and discounts.

**USF's Fraudulent Scheme**

28.    On April 10, 2000, USF was acquired by Royal Ahold. At that time, USF had annual sales of approximately $7 billion. Following its acquisition by Royal Ahold, USF substantially expanded its operations through the aggressive acquisition of other food distribution companies. As a result, by the following year, USF's sales had grown to approximately $12 billion, and by 2002, sales reached approximately $17.5 billion. USF's dramatic growth placed increasing pressure on USF to takes steps to improve its operating margins. As noted above, however, the substantial volume of sales made pursuant to cost-plus contracts hampered USF's ability to increase its margins.

29.    In order to circumvent this problem, USF devised the following schemes whereby it was able to artificially inflate its stated costs used to calculate the prices charged to its customers pursuant to its cost-plus agreements.

30.    USF entered into secret agreements with its suppliers, through the Product Managers, pursuant to which the suppliers would mark up the costs reflected on their invoices to USF above what they otherwise would have charged for the products. After receiving payment from USF, however, the suppliers would pass back to USF the difference between the marked-up price and the

- 9 -

price that the supplier otherwise would have charged absent the secret agreement. Nevertheless, USF would use the marked-up price as its stated actual cost, which USF would then add a specified percentage on top of, as provided for in its cost-plus agreements, in order to arrive at the amount billed to the customer.

31.     In addition to the fraudulent and unlawful overcharges USF received through its Product Managers, additional improper overcharges were facilitated through undisclosed agreements that USF entered into with purportedly independent companies, referred to at USF as "Value Added Service Providers" or "VASPs." The VASPs did not manufacture or process any products themselves, but rather would merely purchase products from other suppliers at USF's direction for the purpose of reselling them to USF. All or most of the VASPs were set up for the express purpose of selling products to USF and all or most of their sales were made to USF. Moreover, all or most of the VASPs purchases were funded by interest free advances from USF.

32.     Pursuant to USF's agreements with the VASPs, USF would direct the VASPs to purchase particular products in particular amounts and at particular prices. At USF's direction, the VASPs would then mark-up the cost on the products and resell them to USF. USF, in turn, would then sell these products to its customers using the inflated costs invoiced by the VASP as USF's actual costs. A percentage then would be added on to USF's reported costs to arrive at the prices charged by USF pursuant to the terms of its cost-plus agreements.

33.     After USF paid the VASPs for the products, the difference between the VASPs' actual costs and the prices charged to USF, minus a nominal transaction fee retained by the VASPs, would be kicked back to USF and recorded on USF's books. The small transaction fee retained by

- 10 -

the VASP, which was approximately $27.50 per invoice regardless of the amount of products involved, was intended to cover the VASPs' operating costs.

34.    USF entered into undisclosed agreements with at least five VASPs to artificially mark up USF's costs, including Specialty Supply Marketing, Inc., and Private Brands Distribution, among others. USF's arrangements with the VASPs served no purpose other than to allow USF to inflate its stated costs and overcharge its customers. Indeed, as noted above, purchases by the VASPs were made at the direction of USF, at prices and in amounts dictated by USF, paid for using funds advanced by USF on an interest free basis. Similarly, the amounts of the mark-ups were also dictated by USF. Further, although the orders were placed through the VASPs, USF would communicate directly with the actual suppliers to determine price, specifications of products and other information related to the orders. In fact, USF would often guarantee the obligations of the VASPs to the suppliers and USF would retain the risk of loss on the products, even though the purchases were routed through the VASPs.

35.    · Accordingly, the kickbacks did not constitute legitimate "promotional allowances" or any other sort of bona fide incentive that USF sometimes received from its suppliers. Unlike legitimate promotional allowances, the kickbacks were not dependent on USF achieving any distribution contingency or USF providing any benefit to the VASPs. Rather, the kickbacks were tied directly and solely to inflated pricing dictated by USF and were sent to USF upon its demand.

36.    Thus, notwithstanding their acronym, the VASPs did not add any legitimate value or provide any legitimate service to USF. Rather, the VASPs were nothing more than straw-men used to defraud USF's Cost Plus Customers.

- 11 -

37.     The following example illustrates how USF's scheme generally worked: At USF's direction, a VASP would purchase an item from a supplier at the price of $1.00 per unit. The purchase was made by the VASP for the purpose of reselling the product to USF, and was funded by and/or guaranteed by USF. At USF's direction, the VASP would then mark-up the price of the product and sell it to USF for $1.10 per unit. USF would, in turn, sell the product to one of its customers. After USF paid the VASP for the product, however, the VASP would refund $1.10 per unit back to USF (minus a nominal transaction fee that would be either per invoice or per volume). Nevertheless, USF would use $1.10 per unit as its stated cost and then add on an additional percentage, for example 6.5%, charging its customer $1.17 per unit pursuant to the terms of its agreement with the customer. As a result, in this example, the transaction would indicate on paper that USF received a 6.5% margin on its cost of $1.10 per unit, or $0.07 per unit, when, in fact, it actually received a 17% margin on its actual cost of $1.00 per unit, or $0.17 per unit. In this manner, USF was able to wrongfully charge its customers an amount equal to both the artificial inflation of the actual cost on the product, plus the contractually established additional percentage on that amount.

38.     In addition to the VASPs, USF entered into undisclosed arrangements with other suppliers that supplied products directly to USF. Pursuant to these arrangements, USF would be told by the supplier the price at which it was prepared to sell a product to USF. USF would then direct the supplier to mark up the price an additional amount, which would be reflected on the invoice sent to USF. USF would then use the invoiced price as its actual cost, which it would use to calculate the price it charged its customers pursuant to its cost-plus agreements. After USF paid the supplier, the supplier would kick back the difference between the marked up price and the price the supplier

- 12 -

actually intended to charge USF.

39.    Certain USF employees (Product Managers) responsible for maintaining relationships with suppliers understood that it was part of their job to get the suppliers to agree to artificially inflate their invoices for products sold to USF and then kick back to USF the difference between the price that the suppliers otherwise would have charged and the amount indicated on the invoice. The amount of these kickbacks was referred to internally at USF as "buying income."

40.    There were at least six Product Managers at USF who were responsible for purchasing different food groups. USF's Product Managers would be given annual "buying income" quotas that they were expected to fulfill and would be paid bonuses based on the extent to which they met their quotas. These employees regularly met or exceeded their buying income quotas in order to ensure that they received their full bonuses.

41.    The amount of the kickbacks resulting from USF's fraudulent scheme were substantial. Indeed, in 2000 through 2003, between 16% and 20% of USF's total sales (i.e. between $1.2 billion and $3.6 billion a year) were of products that were passed through VASPs for the purpose of inflating USF's stated costs. During this same time period alone, the VASPs kicked back to USF hundreds of millions of dollars. This amount is in addition to the substantial kickbacks USF received from suppliers that directly supplied products at inflated prices through USF's Product Managers.

42.    The use of artificially inflated invoices was well known to senior management at both USF and its parent Royal Ahold, and was considered standard operating procedure to increase USF's margins above what it was entitled to under its cost-plus agreements. For example, as stated in an

- 13 -

April 12, 2001 memorandum from the then-Chief Financial Officer of USF, Ernie Smith, to Michial

Meurs, Royal Ahold's Chief Financial Officer at the time and a member of its executive board:

> In the normal course of business, USF has engaged in setting up friendly third parties, *which allow them to establish pads to income.* In substance a new legal entity is set up, the entity will take title to goods; mark them up and sale [sic] the product to USF. In turn by contract, the third party will collect a fee for the service and return to USF allowances. It has been common practice for USF to have these entities forward buy and USF to give them a deposit for inventory. [Emphasis added]

    43.    Mr. Smith sent this memorandum to Mr. Meurs in order to bring to the attention of

Royal Ahold's executive board the serious concerns that Mr. Smith had regarding certain accounting

issues at USF involving the manipulation of reported earnings from promotional allowances received

from various vendors and the VASPs.  Due to his concerns over USF's financial records and the

lack of integrity of USF's management, Mr. Smith stated that he "felt [he] had no alternative other

than to exit the business and disclose the issues."

    44.    Despite being alerted to the accounting fraud going on at USF, Royal Ahold

continued to keep it secret for close to two more years.  Then, on February 24, 2003, Royal Ahold

disclosed that its financial results for 2000 through 2002 would be substantially less than previously

reported due to "significant accounting irregularities" involving USF.  Specifically, Royal Ahold

disclosed that USF had intentionally overstated the amount of promotional allowances received from

its vendors for the purpose of allowing USF to report that it had achieved or exceeded its earnings

targets.  USF accomplished this by recording completely fictitious promotional allowances in

amounts that would cover any shortfall from projected earnings targets. These disclosures, however,

failed to reveal USF's fraudulent scheme alleged herein to overcharge its customers.

- 14 -

45.    The disclosures of the accounting fraud led to extensive civil and criminal investigations of Royal Ahold and USF, as well as significant review of USF's accounting practices by outside accountants retained by Royal Ahold, including PricewaterhouseCoopers ("PwC"), who was retained to conduct a forensic accounting investigation and prepare a report. In connection with this process, PwC discovered USF's scheme to overcharge its cost-plus customers by artificially inflating its stated costs. PwC included information about the scheme in a report submitted to Royal Ahold's Audit Committee on June 25, 2003 (the "PwC Report"), portions of which were recently made public as an exhibit to the Report of Findings of the Enterprise Chamber of the Amsterdam Court of Appeal, dated March 28, 2006.

46.    The PwC Report describes the VASPs in the following manner:

Value Added Service Providers or "VASPs" (6) – special purpose entities *designed to enable mark-up on items for which normal vendor Pas [promotional allowances] do not exist.* VASPs create "pass-back" or "bucket" earnings, which is essentially the markup between manufacturer cost and what the VASP charges the USF branch, less a transaction fee. [Emphasis added]

47.    Moreover, the PwC Report pointed out to Royal Ahold the significant concerns over whether these arrangements are permissible under USF's cost-plus agreements with its customers, stating as follows:

In light of the control aspect, significant questions are raised relative to customer contracts where the Company provides product on a "cost plus" basis. While customer contracts, especially those with commercial customers, appear to address this point by indicating that the customer is not entitled to any rebates or allowances that are not "off invoice" (i.e. the customer is only entitled to discounts that reduce the original invoice to USF), it is unclear whether such contract language would protect the Company if the fact of USF control of the VASPs were disclosed or otherwise known. Total VASP pass-back receipts over the period from April 2000 to December 2002 were $388 million. To calculate a contingent liability, the portion of this earned on volume sold to cost plus contract customers would need to be

- 15 -

determined, and the average "plus" percentage (estimated overall at 7.5%) added thereto.

The VASP entities are closely-held businesses whose principals are well-known by Tim Lee and Mark Kaiser. Except for one, these entities are funded entirely by USF advances, and make all of their sales to USF. Generally, USF directs the VASPs' purchase decisions, including quantities and prices, and for five of the six, has audit rights to their books and records. Furthermore, the VASPs shares are irrevocably assigned to USF as collateral for the advances.

48.     More recently, the VASPs were the subject of testimony given in the criminal trial brought by the United States against Mark Kaiser, USF's former Chief Marketing Officer, for conspiracy and securities fraud. Although the charges against Mr. Kaiser pertained to USF's improper accounting practices, testimony provided at the trial also demonstrates the fraudulent nature of USF's billing practices. Specifically, in testifying at the trial in October, 2006, Timothy Lee, a former USF executive, described the VASPs in the following manner:   "[T]hey were companies that were set up on the behalf of U.S. Foodservice to procure product and capture the difference in the spread on the cost of goods and send it back to U.S. Foodservice."

49.     When asked to describe the function of one of the VASPs, named Private Brands, the following testimony was elicited from Mr. Lee:

A. Gordon Redgate owns Private Brands. Private Brands is the third-party billing company that U.S. Foodservice uses.

Q. What does that mean again?

A. It means that they – they take product, they – U.S. Foodservice buys product and bills it through Gordon's company and then collects the Pas from Gordon's company.

Q. Now, just the – when you say "Pas," do you mean the spread?

A. Yes, the difference of spread.

Q. Or the markup between what Private Brands has paid for the product and what USF pays from the product when it buys it from Private Brands?

A. Yes.

- 16 -

50.    Mr. Lee further described how the kickbacks received from the VASPs were referred to internally at USF, testifying as follows:

A. They're called shelters, self-generated promotional allowances.

Q. Self-generated because Mr. Redgate's company is going out and buying the product, right, at a certain price, and then is selling it back to USF at a higher price, correct?

A. Mr. Redgate's company is taking title of the product at a lower price, billing U.S. Foodservice at a higher price at U.S. Foodservice's direction. Mr. Redgate's company, this company here, Private Brands, did business solely with U.S. Foodservice.

Q. And then that difference between what Private Brands bought it for and then sold it to USF, who gets that difference?

A. That's the difference that comes back to U.S. Foodservices as income.

Q. And Mr. Redgate also gets a percentage of that or –

A. He was paid a transaction fee by invoice.

51.    Demonstrating the substantial amount of kickbacks USF received from the VASPs, Mr. Lee testified that the markup transferred back to USF from the single VASP, Private Brands, amounted to more than $58 million in 2002 alone.

52.    Mr. Lee then provided the following example to illustrate how the process worked:

US Foodservice would – would buy a case of product let's say for $10. We would then tell Mr. Redgate at private brands to bill US Foodservice at $11 for that same case. The difference between the 10-dollar price that Mr. Redgate actually paid for it and the 11-dollar price that was invoiced to US Foodservice, that difference of 1 dollar is what went into those buckets. Those buckets then were sent to US Foodservice as income, sheltered income.

53.    Mr. Lee also explained how this would impact the mark up charged to USF's cost-plus customers as follows:

Q. And then, Mr. Lee, when US Foodservice went to sell the product to street or chain customers, would there be a markup on top of the $11?

A. Yes. That was the – the cost of goods just coming into US and then there was the

- 17 -

markup that US Foodservice put on it to the customers.

Q. Cost plus.

A. Cost plus.

54.     Upon hearing Mr. Lee's explanation, the Court expressed some confusion as to what legitimate purpose the arrangements with the VASPs could have, resulting in the following colloquy with the witness:

> THE COURT: I don't understand the sense of that. In other words, if the vendor received $10, right –
>
> THE WITNESS: Yes, sir.
>
> THE COURT: – and who pays the extra dollar, anybody?
>
> THE WITNESS: The extra dollar is then passed on in the cost of goods to US Foodservice's customers. US Foodservice works from a higher base cost of $11, and that's where all the markup starts from.
>
> THE COURT: And is it or is it not considered a promotional allowance?
>
> THE WITNESS: It is part of the promotional allowance. It is a form of promotional allowance called a shelter.
>
> BY MR. SABOT:
>
> Q. But it's different from –
>
> THE COURT: But the normal promotional allowance is paid for by the vendor.
>
> THE WITNESS: That is correct.
>
> THE COURT: The vendor isn't paying anything, as far as what we're talking about now, right?
>
> THE WITNESS: That is correct.

55.     In sum, Mr. Lee testified that USF's arrangement with the VASPs was put in place solely for the purpose of allowing USF "to have a higher billing cost" and a higher mark-up on that cost. Such an arrangement is in direct contravention of USF's cost-plus arrangements with its customers.

56.    The purpose and effect of USF's scheme is succinctly described in papers filed by several former USF employees in connection with a lawsuit involving a dispute over a non-compete agreement brought by USF in the United States District Court for the District of Massachusetts entitled, *U.S. Foodservice, Inc. v. Arthur Tsebetzis, et al.* Specifically, a brief filed in that action on February 3, 2004, claims, as supported by an affidavit submitted by Arthur Tsebetzis, a former senior vice president and divisions president of USF, that:

> USF has inflated its costs to customers via fictitious or USF-controlled middlemen and transport companies. Since USF bills its customers on a "cost-plus" basis – charging its customers for the cost of goods plus a certain percentage – USF has artificially and fraudulently inflated the prices its customers pay.

57.    Thus, by engaging in the foregoing scheme USF was able to artificially inflate the costs that it used to calculate the prices charged to its customers, allowing USF to reap significantly greater profits than it otherwise could have under the terms of its cost-plus agreements.

## RICO ALLEGATIONS

**The USF Enterprise**

58.    USF is a "person" within the meaning of 18 U.S.C. §1961(3).

59.    Based upon plaintiffs' current knowledge, the following persons constitute a group of individuals associated in fact that plaintiffs refer to as the USF Enterprise: (1) USF; (2) USF's five or more VASPs; and (3) other USF suppliers that agree to artificially inflate the costs charged to USF and pay kickbacks to USF.

60.    The USF Enterprise is an ongoing organization which engages in, and whose activities affect, interstate commerce. The members of the USF Enterprise function as a continuing

- 19 -

unit as described below and share the common purpose of maximizing their profits from the sale of food and related products to USF customers.

61.     While USF participates in and is a member and part of the USF Enterprise, it also has an existence separate and distinct from the enterprise.

62.     In order to successfully overcharge plaintiffs and the class in the manner set forth above, USF needed a system that would allow USF to demonstrate that its stated cost of sales were higher than they actually were. The USF Enterprise provides USF with that system. USF controls and operates the USF Enterprise as follows:

(a)     By entering into agreements with VASPs and other suppliers pursuant to which the amounts invoiced USF are higher than the costs actually charged to USF;

(b)     By dictating the products to be purchased pursuant to these agreements and the amounts by which the invoices received from the suppliers were to be inflated;

(c)     By dictating the amount of kickbacks to be paid by the suppliers to USF; and

(d)     By concealing the existence and purpose of the agreements with the suppliers from USF's customers.

63.     As set forth above, the USF Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which USF engages.

**Predicate Acts**

64.     Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. §1341 (relating to mail fraud) and 18 U.S.C. §1343 (relating to wire

fraud). As set forth below. USF has and continues to engage in conduct violating each of these laws to effectuate its scheme.

65.    For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises USF in violation of 18 U.S.C. §1341, placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carrier, and received matter and things from the Postal Service or commercial interstate carriers, including but not limited to contracts, invoices, correspondence, and payments.

66.    For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises, USF, also in violation of 18 U.S.C. §1343, transmitted and received by wire, matter and things which include but are not limited to contracts, invoices, correspondence, and payments.

67.    The matter and things sent by USF via the Postal Service, commercial carrier, wire or other interstate electronic media include, *inter alia*:

a.    contracts containing false and fraudulent misrepresentations that USF would charge its cost-plus customers prices that would be based upon USF's actual costs;

b.    invoices that falsely and fraudulently misrepresented the amounts that USF's cost-plus customers owed USF under the terms of its cost-plus agreements;

c.    materials that falsely and fraudulently supported the basis of USF's purported actual costs used to calculate the prices charged to its customers pursuant to its cost-plus contracts; and

- 21 -

d.      materials that falsely and fraudulently described the services that USF offered and its relationship with its suppliers.

68.     Other matter and things sent through or received from the Postal Service, commercial carrier or interstate wire transmission by USF included information or communications in furtherance of or necessary to effectuate the scheme.

69.     USF's misrepresentations, acts of concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving plaintiffs and the class and obtaining their property of USF's gain.

70.     USF either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material, and plaintiffs and the class relied on the misrepresentations and omissions as set forth above.

71.     As a result, USF has obtained money and property belonging to plaintiffs and class members, and plaintiffs and the class have been injured in their business or property by the defendant's overt acts of mail and wire fraud.

**Pattern of Racketeering Activity**

72.     USF has engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing or aiding and abetting in the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§1341 and 1343 as described above, within the past ten years.  In fact, USF has committed thousands of acts of racketeering activity.  Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results and impacted similar victims, including plaintiffs and

class members.

73.    The multiple acts of racketeering activity which defendant committed and/or conspired to or aided and abetted in the commission of, were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

## CLASS ACTION ALLEGATIONS

74.    Plaintiffs bring this action against defendant on their own behalf and, pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, as a class action on behalf of a class of persons including all entities and individuals that purchased products from USF or one of its subsidiaries on a cost-plus basis and were overcharged as a result of USF having artificially inflated its stated cost of goods sold.

75.    Excluded from the Class are defendant, any entity in which defendant has a controlling interest or is a parent or subsidiary of, or any entity that is controlled by defendant and any of its officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns.

76.    There are thousands of members of the Class. Accordingly, the Class is so numerous that joinder of all members is impracticable. The Class is ascertainable, as the names and addresses of all Class members can be identified in business records maintained by defendant.

77.    Plaintiffs will fairly and adequately protect the interests of the Class and have no interests adverse to, or which directly and irrevocably conflict with, the interests of other Class members. Plaintiffs are represented by counsel experienced and competent in the prosecution of

complex class action litigation.

78.    There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class members. Such common questions include, *inter alia*:

    a.    Whether USF has engaged in a scheme to improperly and unlawfully inflate the prices charged to its customers;

    b.    Whether USF has engaged in mail and wire fraud.

    c.    Whether USF engaged in a pattern of racketeering activity.

    d.    Whether the USF Enterprise is an enterprise within the meaning of 18 U.S.C. 1961(4).

    e.    Whether USF conducted or participated in the affairs of the USF Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

    f.    Whether USF's overt and/or predicate acts in violation of 18 U.S.C. 1962(c) proximately cause injury to plaintiffs' and class members' business or property.

    g.    Whether USF fraudulently concealed its scheme.

    h.    Whether USF has breached its contractual obligations to its customers under its cost-plus contracts.

    i.    Whether USF has breached its implied duty of good faith and fair dealing.

79.    Plaintiffs' claims are typical of the claims of the Class members because they originate from the same illegal, fraudulent, and confiscatory practices of USF, and USF acts in the same way toward plaintiffs and the Class.

80.    Plaintiffs will fairly and adequately protect the interests of the members of the Class,

are committed to the vigorous prosecution of this action, have retained counsel competent and experienced in class litigation and have no interests antagonistic to or in conflict with those of the Class. As such, plaintiffs are adequate Class representatives.

81.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for the party opposing the Class.

82.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. Further, the expense and burden of individual litigation make it impossible for all the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### (Violation of 18 U.S.C. § 1962(c))

83.     Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

84.     This claim for relief arises under 18 U.S.C. §1962(c).

85.     As set forth above, USF has violated 18 U.S.C. §1962(c) by conducting, or participating directly or indirectly in the conduct of the affairs of the USF Enterprise through a pattern of racketeering.

86.     As a direct and proximate result, plaintiffs and the Class members have been injured

in their business or property by the predicate acts which make up the defendant's patterns of racketeering activity through the USF Enterprise.

87.    Specifically, plaintiffs and Class members have been injured in their business or property by having paid too much for foodservice products purchased from USF pursuant to cost-plus agreements entered into with USF.

## COUNT II

### (Breach of Contract)

88.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

89.    Plaintiffs and the other members of the Class entered into contracts with USF or one of its acquired subsidiaries pursuant to which plaintiffs and the members of the Class have purchased foodservice products from USF on a cost-plus basis.

90.    The terms of these contracts provide that the prices USF charges plaintiffs and the other members of the Class shall equal USF's actual invoice costs plus a specified percentage set forth in the agreements.

91.    As described above, USF breached the terms of these contracts by getting its suppliers and VASPs to provide USF with inflated invoices for the sole purpose of artificially increasing USF's reported costs. The suppliers and VASPs would then kickback to USF the difference between the prices indicated on the invoices and the prices actually charged by the suppliers. Nevertheless, USF uses the inflated invoices as its stated actual cost, which it in turn uses to calculate the amount billed to plaintiffs and the members of the Class.

- 26 -

92.    The kickbacks paid to USF do not constitute legitimate promotional allowances or incentives that USF is entitled to retain. Accordingly, as a result of USF's conduct, plaintiffs and the Class have been charged more than they should have been under the terms of their cost-plus agreements.

93.    USF has also breached its implied duty of good faith and fair dealing imposed on all of its cost-plus contracts. In this regard, by intentionally getting its suppliers to inflate the amounts they invoice USF and/or by purchasing products through the VASPs for the purpose of increasing its stated costs, USF has prevented plaintiffs and members of the Class from receiving the benefit of their cost-plus agreements.

94.    As a result of the foregoing, plaintiffs and Class members have been injured by having paid too much for foodservice products purchased from USF pursuant to cost-plus agreements entered into with USF or one of its acquired subsidiaries.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment in their favor and in favor of the Class against defendant as follows:

A.    Determining that this action may be maintained as a class action under Fed. R. Civ. P. 23(a) and (b);

B.    Declaring that USF has violated Section 1962(c) of RICO and breached its contractual obligations;

C.    Preliminarily and permanently enjoining USF and all persons acting under, in concert with, or for it, from continuing such conduct;

- 27 -

D.    Ordering USF to pay treble the amount of damages suffered by plaintiffs and the Class as a result of USF's violations of Section 1962(c) of RICO;

E.    Awarding plaintiffs the costs and disbursements of this action, including reasonable attorneys' fees and the reimbursement of expenses in amounts to be determined by the Court;

F.    Awarding prejudgment interest; and

G.    Granting such other and further relief as this Court deems to be just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury.

Dated:  December 18, 2006

Respectfully submitted,

THE PLAINTIFFS

By:   /s/ James E. Hartley, Jr.
     James E. Hartley, Jr.
     Federal Bar No. ct 08275

**DRUBNER HARTLEY & O'CONNOR,
L.L.C.**
500 Chase Parkway
Waterbury, CT 06708
(203) 753-9291

and

Charles Hellman
Cary Talbot
One Penn Plaza, Suite 4507
New York, NY 10119
(212) 736-2121

- 28 -

**WHATLEY DRAKE, LLC**
Edith M. Kallas
Joe R. Whatley, Jr.
Deborah Clark Weintraub
1540 Broadway, 37th Floor
New York, NY 10036
(212) 447-7070

**FOOTE, MIERS, MIELKE & FLOWERS**
Robert M. Foote
416 South Second Street
Geneva, IL 60134
(630) 232-6333

**GRAY & WHITE**
Mark Gray
1200 PNC Plaza
Louisville, KY 40202
(502) 585-2060

**STROM LAW FIRM, PLLC**
J. Preston Strom, Jr.
1501 Main Street, Suite 700
Columbia, SC 29201
(803) 252-4800

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on December 18, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys presently enrolled in this matter.

/s/ James E. Hartley, Jr.
James E. Hartley, Jr.