# Exhibit B

FILED

AUG 17 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1  STEVEN KAUFHOLD (SBN #157195)
   **AKIN GUMP STRAUSS HAUER & FELD LLP**
2  580 California, 15th Floor
   San Francisco, California 94104-1036
3  Telephone:    415-765-9500
   Facsimile:    415-765-9501
4  skaufhold@akingump.com

5  Attorneys for Plaintiff Catholic Healthcare West
   [Additional counsel appear on signature page.]

6

7

E-filing

8                    **UNITED STATES DISTRICT COURT**

9                   **NORTHERN DISTRICT OF CALIFORNIA**

10                      **SAN FRANCISCO DIVISION**

11                                              **C 07 4242**

12  CATHOLIC HEALTHCARE WEST, a          Case No.
    California non-profit corporation,
13
                                          **CW**
14           Plaintiff,

15      v.                               **COMPLAINT AND DEMAND FOR JURY**
                                         **TRIAL FOR:**
16  KONINKLIJKE AHOLD N.V., a
    Netherlands public holding company, U.S.   1.   **VIOLATION OF RACKETEER**
17  FOODSERVICE, INC., a Delaware                 **INFLUENCED AND CORRUPT**
    corporation, GORDON REDGATE, an               **ORGANIZATIONS ACT, 18 U.S.C.**
18  individual, and BRADY SCHOFIELD, an           **§§ 1961** *et seq.*
    individual,
19                                           2.   **BREACH OF CONTRACT**
             Defendants.
20                                           3.   **FRAUDULENT INDUCEMENT**
                                                 **CONCEALMENT AND**
21                                               **NONDISCLOSURE**

22                                           4.   **VIOLATION OF CAL. BUS. &**
                                                 **PROF. CODE §§ 17200** *et seq.*
23
                                             5.   **UNJUST ENRICHMENT**
24
                                             6.   **IMPOSITION OF**
25                                               **CONSTRUCTIVE TRUST**

26

27                                          **CLASS ACTION**

28

ORIGINAL

                                    1

COMPLAINT

1      Plaintiff Catholic Healthcare West ("CHW"), by and through its undersigned attorneys, based

2 upon personal knowledge with respect to its own acts, and as to all other matters based upon the

3 investigation of Plaintiff's counsel to date, hereby avers as follows:

4   **I.**    **Nature of the Complaint**

5       1.    CHW brings this action for damages, disgorgement, restitution and injunctive relief on

6 behalf of itself and all others similarly situated against Koninklijke Ahold N.V. ("Royal Ahold"), U.S.

7 Foodservice, Inc. ("USF"), Gordon Redgate ("Redgate") and Brady Schofield ("Schofield") for

8 violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.*,

9 ("RICO"), fraudulent inducement, concealment and nondisclosure, breach of contract, violation of

10 California Business and Professions Code §§ 17200 *et seq.*, unjust enrichment and constructive trust.

11       2.    As the second largest broadline foodservice distributor in the United States, USF

12 provides food products and services to approximately 250,000 customers. CHW and USF's other

13 customers purchased food and other products from USF with the expectation that USF would act

14 honestly and in a commercially reasonable manner. This case arises out of Defendants' schemes to

15 falsely inflate the prices USF charged to its customers since at least 2000 through the use of shell

16 companies, sham transactions and phony invoices. Defendants implemented their schemes on a

17 nationwide scale, effectively stealing hundreds of millions of dollars from innocent customers across

18 the country including thousands of hospitals and restaurants. CHW, the largest not-for-profit hospital

19 system in California, brings this lawsuit to remedy Defendants' wrongful conduct and to recover the

20 losses of CHW and of all others similarly situated, including treble and punitive damages.

21       3.    Under the schemes, USF, with the full knowledge, approval and participation of Royal

22 Ahold, intentionally inflated the cost component (*i.e.*, "Landed Cost" or other similarly defined cost

23 component) of the price it charged to its customers under contractual arrangements defining this price

24 in terms of a cost component plus a mark-up or distribution fee (*e.g.*, cost-plus or margin-on-sell

25 contracts). These contractual arrangements are hereinafter referred to as "cost-plus contracts." USF

26 hid the inflation through the use of shell companies. USF set up these shell companies for the sole

27 purpose of posing as middlemen in the food distribution chain. USF also inflated the cost component

28 by persuading certain suppliers to pay promotional allowances unrelated to any actual value provided.

2

COMPLAINT

1    Six of the shell companies, ostensibly owned by Defendants Redgate and Schofield, were called

2    "Value Added Service Providers" ("VASPs"). They were so-called to hide and conceal from USF's

3    customers their true purpose: to pretend to buy and then re-sell food to USF at a higher "invoice cost."

4    USF then used the VASP transactions to calculate the cost component charged to USF's customers.

5    Over a period of several years, Defendants USF, Royal Ahold, Redgate and Schofield executed the

6    VASP scheme to "purchase" almost $8.5 billion in products and overcharge USF's customers,

7    including CHW, hundreds of millions of dollars.

8          4.     The existence of the VASPs was first disclosed to Royal Ahold shareholders in October

9    2003 as part of Royal Ahold's announcements that it would be restating its earnings for fiscal years

10    2000 and 2001 by more than $800 million after discovering accounting fraud at USF. Royal Ahold's

11    2003 announcements led the SEC, DOJ and Netherlands authorities to launch parallel investigations

12    into whether USF booked inflated and not yet earned "promotional allowances" from suppliers.

13          5.     As a result of those investigations, in October 2004, the SEC charged Royal Ahold and

14    its top three executives—Cees van der Hoeven, CEO, A. Michiel Meurs, CFO, and Jan Andreae,

15    EVP—with securities fraud. The company and two former executives settled the charges on October

16    18, 2004. Specifically, van der Hoeven and Meurs consented to orders barring them from serving as

17    officers or directors of a public company. Subsequently, in November 2005, Royal Ahold settled a

18    U.S. shareholder class action for $1.1 billion, and in May 2006, Royal Ahold's former CEO and CFO

19    were convicted of fraud in the Netherlands. Additionally, four former USF executives—Michael

20    Resnick, CFO, Mark Kaiser, Chief Marketing Officer, Timothy Lee, EVP of Purchasing, and William

21    Carter, VP of Purchasing, Supply Chain—have been convicted of, or pled guilty to, criminal charges

22    arising from the accounting fraud. In July 2004, Lee and Carter pled guilty to criminal securities fraud

23    and agreed to cooperate with investigators. Resnick later pled guilty to conspiracy to submit false

24    books, records and accounts and received three years probation. On May 17, 2007, Kaiser was

25    sentenced to seven years in prison. In addition to Royal Ahold, USF and their executives,

26    approximately a dozen co-conspirators from USF's supplier companies have pled guilty to fraud,

27    conspiracy and/or insider trading, including the two individual defendants in this matter—Schofield

28    and Redgate.

3

COMPLAINT

6.     While the prior SEC and DOJ investigations and shareholder suits addressed and resolved important issues of public trust and harm to Royal Ahold's shareholders, those investigations failed to redress a more pernicious harm, the harm to USF's customers. Moreover, Royal Ahold actively tried to cover-up the effects of the schemes on USF's customers through misleading financial statements issued as part of "resolving" USF's accounting fraud. USF and Royal Ahold both profited from this cover-up. This action will provide redress for USF's customers.

**II.    Jurisdiction and Venue**

7.  ·   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1367, and 18 U.S.C. § 1964(c). This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(a), as the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states. This Court also has jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), providing for jurisdiction where, as here, "any member of a class of plaintiffs is a citizen of a State different from any defendant" and the aggregated amount in controversy exceeds five million dollars ($5,000,000), exclusive of interests and costs. See 28 U.S.C. §§ 1332(d)(2) and (6).

8.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), 18 U.S.C. § 1965 and the Governing Law and Venue provision in the National Distribution Agreement entered into by Premier, Inc. and USF's predecessor Alliant Foodservice, Inc. (the "Premier contract"). Premier and its affiliates (collectively "Premier") provide contracting services for certain categories of healthcare supplies, equipment and services. CHW is a Premier member and has purchased food-related products from USF pursuant to the Premier contract. A substantial part of the events giving rise to Plaintiff's claims occurred in this district, including many acts that were part of Defendants' unlawful conspiracy and their unlawful acts in furtherance thereof. Further, the ends of justice require that Defendants be brought before this Court for the adjudication of Plaintiff's claims.

4

### III.    Parties

9.    Plaintiff CHW is a non-profit corporation organized under the laws of the State of California, with its principal place of business at 185 Berry Street, Suite 300, San Francisco, CA 94107.

10.    CHW is a system of dozens of hospitals and medical centers in California, Arizona and Nevada.  Founded in 1986, CHW is one of the largest hospital systems in the nation and the largest not-for-profit hospital provider in California.

11.    In 1999, CHW and its hospitals and medical centers became members of Premier, Inc., a Group Purchasing Organization engaged in contracting services for its members to help them manage and reduce supply costs.

12.    Defendant Royal Ahold is a public holding company in The Netherlands with its principal place of business at Piet Heinkade 167 – 173, 1019 GM, Amsterdam, The Netherlands.  As a part of its operations, Royal Ahold owns and operates grocery stores and food service companies in the United States and Europe through subsidiaries and affiliates.  Royal Ahold's companies generated more than 44 billion euros in their fiscal year 2006.

13.    Defendant USF is a corporation organized under the laws of the State of Delaware, with its principal place of business at 9755 Patuxent Woods Drive, Columbia, Maryland 21046.

14.    Before it was purchased by Royal Ahold in April 2000, USF's stock was publicly traded on the New York Stock Exchange.  In late 2001, Royal Ahold entered into an agreement through its subsidiary, USF, to acquire all outstanding shares of Alliant Exchange, Inc., the parent company of Alliant Foodservice, Inc. ("Alliant").

15.    Defendant Brady Schofield is an individual who, upon information and belief, resides in Naples, Florida.  During the relevant period, Schofield was president and, upon information and belief, the principal owner of the following corporations:  (1) Frozen Farms, Inc., (2) Produce Solutions, Inc., (3) Seafood Marketing Specialties, Inc., and (4) Specialty Supply & Marketing, Inc.

16.    Defendant Gordon Redgate is an individual who, upon information and belief, resides in Chatham, New Jersey.  During the relevant period, Redgate was president and, upon information and

5

1    belief, the principal owner of the following corporations: (1) Commodity Management Systems, Inc.

2    and (2) Private Label Distribution, Inc.

3    **IV.     Other Entities**

4        17.     Frozen Farms, Inc. ("Frozen Farms") was a corporation organized under the laws of the

5    state of Rhode Island, with its principal place of business in Middletown, Rhode Island. Frozen Farms

6    purportedly transacted in frozen and processed foods.

7        18.     Produce Solutions, Inc. ("Produce Solutions"), upon information and belief, was a

8    corporation organized under the laws of the state of Rhode Island, with its principal place of business

9    in Newport, Rhode Island. Produce Solutions purportedly transacted in produce.

10       19.     Seafood Marketing Specialists, Inc. ("Seafood Marketing Specialists") is a corporation

11    organized under the laws of the State of Rhode Island, with its principal place of business in

12    Middletown, Rhode Island. Seafood Marketing Specialists purportedly transacted in seafood products.

13       20.     Specialty Supply & Marketing, Inc. ("Specialty Supply & Marketing") was a

14    corporation organized under the laws of the State of Rhode Island, with its principal place of business

15    in New Bedford, Massachusetts. Specialty Supply & Marketing purportedly provided sales support.

16       21.     Commodity Management Systems, Inc. ("Commodity Management") is a corporation

17    organized under the laws of the State of New Jersey, with its principal place of business in Chatham,

18    New Jersey. Commodity Management purportedly transacted in frozen fruits and vegetables.

19       22.     Private Label Distribution, Inc. ("Private Brands") was a corporation organized under

20    the laws of the State of New Jersey, with its principal place of business in Summit, New Jersey.

21    Private Brands purportedly transacted in canned food products.

22    **V.     Class Allegations**

23       23.     Plaintiff brings this suit as a class action pursuant to Federal Rules of Civil Procedure

24    23(a), (b)(2) and (b)(3), on its behalf and as representative of the following classes of persons and

25    entities ("the Class"):

26         Any person in the United States who purchased products from USF pursuant to contractual
          arrangements in which the price paid was defined in terms of a cost component plus a mark-up,

27        and for which USF used a VASP transaction to calculate the cost component. Excluded from
          the Class are USF, USF's parent company, Royal Ahold, any other Royal Ahold or USF

28        subsidiary or affiliate, as well as any entity controlled by Royal Ahold or USF.

6

COMPLAINT

1    Additionally, any person in California who purchased products from USF pursuant to
2    contractual arrangements in which the price paid was defined in terms of a cost component plus
      a mark-up, and for which USF used a VASP transaction to calculate the cost component.
3    Excluded from the Class are USF, USF's parent company, Royal Ahold, any other Royal Ahold
      or USF subsidiary or affiliate, as well as any entity controlled by Royal Ahold or USF.

4        24.    The members of the Class are so numerous that separate joinder of all Class members is
5    impracticable pursuant to Rule 23(a) of the Federal Rules of Civil Procedure. Although the exact
6    number of class members is not yet known, on information and belief, USF has tens of thousands of
7    customers who bought products pursuant to cost-plus contracts and thus who were overcharged as
8    described herein. These customers are geographically dispersed throughout the United States.

9        25.    Questions of law or fact common to Plaintiff's claims and those of the Class
10   predominate over any question of law or fact affecting only individual members of the Class.
11   Questions of law and fact common to the Class include, *inter alia*, the following:

12           a.    Whether USF engaged in the fraudulent schemes or artifices described herein;

13           b.    Whether USF, together with Frozen Farms, Produce Solutions, Seafood
14                 Marketing Specialists, Specialty Supply & Marketing, Commodity
                   Management, and Private Brands formed an association-in-fact enterprise (the
15                 "VASP Enterprise" as defined below) for the purpose of carrying out
16                 Defendants' scheme;

17           c.    Whether Private Brands, Commodity Management, Frozen Farms, Produce
                   Solutions, Seafood Marketing Specialists, and Specialty Supply & Marketing
18                 each constitute a separate enterprise (the "Individual VASP Enterprises" as
                   defined below) for the purpose of carrying out Defendants' scheme;
19
20           d.    Whether RICO Defendants USF, Royal Ahold, Redgate and Schofield were
                   associated with the alleged enterprises to conduct or participate, directly or
21                 indirectly, in the affairs of an enterprise through a pattern of racketeering activity
                   in violation of 18 U.S.C. § 1962(c);
22
23           e.    Whether RICO Defendants USF, Royal Ahold, Redgate and Schofield engaged
                   in a pattern of racketeering activity with the intent to defraud Plaintiff and the
24                 Class using the U.S. mails and interstate wire service in violation of 18 U.S.C.
                   §§ 1341 and 1343 (mail and wire fraud);
25
26           f.    Whether RICO Defendants USF, Royal Ahold, Redgate and Schofield engaged
                   in a pattern of racketeering activity to hide, conceal and promote their scheme
27                 by laundering monetary instruments or engaging in monetary transactions
                   involving criminally derived property in violation of 18 U.S.C. §§ 1956 and
28                 1957;

7

COMPLAINT

1

2

g.    Whether RICO Defendants USF, Royal Ahold, Redgate and Schofield conspired to violate 18 U.S.C. § 1962(c) as prohibited by 18 U.S.C. § 1962(d);

3

4

h.    Whether USF's practices constituted a breach of its cost-plus contractual arrangements with its customers;

5

i.    Whether USF's practices unjustly enriched Royal Ahold when it accepted and retained the proceeds of the falsely inflated invoices; and

6

7

j.    Whether a constructive trust should be imposed on all the property Royal Ahold acquired as a result of Defendants' schemes.

8        26.    Plaintiff's claims are typical of the Class' claims because Plaintiff and other Class

9   members purchased products from USF under cost-plus contractual arrangements at a price that USF

10  unlawfully inflated through its schemes or artifices to defraud, including USF's use of VASPs to create

11  false and inflated invoice costs used to calculate the cost component of the price charged to USF's

12  customers.

13        27.    As Class Representative, CHW will fairly and adequately protect the interests of the

14  Class, and to that end has engaged counsel experienced in both class actions and other complex

15  litigation including federal RICO claims; CHW has no interests antagonistic to, or in conflict with, the

16  Class it seeks to represent; and CHW will vigorously prosecute the claims of the Class through

17  qualified and experienced counsel.

18        28.    Class representation is superior to other available methods for the fair and efficient

19  adjudication of the controversy asserted herein because of the many questions of law and fact that are

20  common to Plaintiff's claims and those of the Class. Any possible issues applicable to individual class

21  members that may exist in managing this class action are greatly outweighed by the advantages of

22  class treatment, particularly given the impact of the schemes across USF's broad customer base and the

23  schemes' specific design to be implemented market-wide and operated in a manner to affect all USF's

24  customers with cost-plus contractual arrangements.

25        29.    Class treatment will permit a large number of similarly situated persons to prosecute

26  their common claims in a single forum simultaneously, efficiently, and without unnecessarily

27  duplicating evidence, effort, and expense that numerous individual actions would engender. The

28

COMPLAINT

1   advantages of class treatment include providing a method for redressing these claims that otherwise

2   might not warrant individual litigation.  A class action also eliminates the potential for inconsistent

3   adjudication of multiple individual claims.

4   **VI.      Factual Background**

5        **A.      The Nature of USF's Business**

6        30.      USF is the second largest broadline foodservice distributor in the United States based on

7   2006 net sales.  USF provides its products and services to approximately 250,000 customers.

8        31.      As part of its business operations, USF purchases food and related products from food

9   manufacturers and other suppliers and then markets, sells and delivers those products to chain

10  restaurants, independent restaurants, and healthcare, hospitality, government and educational facilities

11  across the United States.

12       32.      When distributing food and related products, USF typically enters into a cost-plus

13  arrangement with its customers.  Under these contractual arrangements, USF agrees to charge its

14  customer a price based on a cost component plus a mark-up of either a fixed percentage or a set dollar

15  amount which is added on to the cost component of the agreement.  The cost component that serves as

16  USF's basis for the mark-up is typically referred to as "Landed Cost."

17       33.      Moreover, USF's cost-plus contractual arrangements allow the price charged to USF's

18  customers to not account for the amount of promotional allowances paid by a supplier to USF.

19       34.      Promotional allowances are rebates, discounts, credits or similar consideration that

20  suppliers provide to customers to promote the sale of their goods.

21       35.      Promotional allowances can take various forms including signing bonuses, volume-

22  based programs, seasonal programs, growth programs, corporate marketing allowances, and local

23  marketing funds and food shows.

24       36.      In some cases, suppliers pay a distributor a fixed sum of money up-front to encourage

25  the distributor to carry or promote only that supplier's brands.  Another type of allowance is known as

26  a growth program under which a supplier agrees to rebate a percentage of the product's price to the

27  distributor if the distributor increases sales of a given product over a specified period of time.

28

COMPLAINT

37.    A promotional allowance reduces the price the distributor pays to acquire a product that it intends to re-sell.  Correspondingly, the promotional allowance paid by the supplier to the distributor reduces the supplier's profit margin.

38.    Distributors often refer to promotional allowances as "sheltered income" because they do not appear on the distributor's purchase orders or invoices received from the supplier.

**B.    Defendants' Schemes to Defraud**

39.    Defendants designed and executed schemes to defraud their customers, including CHW, by falsely inflating the cost component of the price charged to their cost-plus customers.  Typically, the schemes took one of two forms.

**1.    The VASP Scheme**

40.    One scheme involved creating and controlling fictitious middleman companies between USF and the food supplier.  Defendants misleadingly called six of these middlemen Value Added Service Providers to suggest that they added some economic value to the distribution chain.

41.    Simply put, USF falsely inflated the cost component it charged to its customers, and USF used the VASPs to conceal these overcharges from its customers.  In many cases, USF negotiated a purchase price for products from suppliers, directed the VASPs to "purchase" those products at that negotiated price, funded the "purchase," and then directed the VASPs to "resell" the same products at a falsely inflated price to USF.  USF would then use the falsely inflated price to calculate the cost component it charged to its customers.  At the same time, USF would direct the VASPs to kick back to USF the difference between the falsely inflated price the VASPs "charged" USF for the product and the original price USF negotiated with the suppliers, less a minimal "transaction fee."

42.    In reality, the VASPs had no legitimate or commercially reasonable business purpose.  Instead, they served only as vehicles to falsely increase the cost component of the price charged to USF's customers and to generate a bogus paper trail that would conceal USF's illegal conduct from its customers.

43.    Although independently owned, USF effectively controlled the VASPs and directed their business on a daily basis.  VASP related transactions with USF accounted for almost one-fifth of all of USF's purchases.  In fact, Royal Ahold stated in its fiscal year 2002 Form 20-F, filed on October

10

COMPLAINT

1  16, 2003, that the VASPs' "sales" to USF during the period from 2000 to 2003 totaled approximately

2  eight billion euros and that these sales included primarily private label and signature brand products.

3        44.    In its 2004 Form 20-F, filed on April 14, 2005, Royal Ahold further disclosed an

4  additional four hundred and eighty nine million euros in VASP "sales" to USF, and stated that USF

5  ended its relationship with five of the VASPs through a phased transition of services.

6        45.    USF and Royal Ahold funded the VASPs' operations through interest-free advances and

7  financial guarantees and 100% of the VASPs' shares were assigned and irrevocably transferred to USF

8  as collateral for these advances.

9        46.    Indeed, the VASPs were not provided with any owner-supplied funding whatsoever and

10  the "transaction fees" paid to the VASPs were intentionally structured to enable the VASPs to "break

11  even."

12        47.    Defendants Schofield and Redgate knew each other and were in frequent contact.  In

13  fact, Schofield, Redgate and a USF executive who supervised the fraudulent VASP scheme on a day-

14  to-day basis, were sometimes referred to around USF's offices as "the Three Musketeers."

15        48.    Royal Ahold, Redgate and Schofield all had knowledge of, and willingly participated in,

16  the orchestrated scheme to use the VASPs to falsely inflate the invoice cost used to calculate the cost

17  component so that they could in turn defraud USF's customers.  Furthermore, Redgate had knowledge

18  that USF was buying certain categories of food products through Schofield's VASPs and Schofield had

19  knowledge that USF was buying other types of food products through Redgate's VASPs.

20        49.    For example, Defendant Redgate created Private Brands, one of the VASPs, at the

21  request of USF.  The purpose for establishing Private Brands was to create an entity to put a "spread"

22  on the goods that USF sold to its customers.

23        50.    Private Brands did not negotiate contracts with the suppliers, USF did.  Private Brands

24  only placed orders that USF instructed it to place, from the suppliers USF told it to order from, at a

25  price negotiated directly between the supplier and USF.

26        51.    Upon information and belief, Private Brands did not take possession of the food and

27  related products it ordered at USF's direction.  Nor did Private Brands have sufficient funds to pay for

28  the products it ordered without interest-free loans from USF.

COMPLAINT

52.    Under the VASP scheme, USF would negotiate a price directly with a supplier. For example, USF would negotiate a price directly with the supplier for $10 a case for whole kernel cut corn. Then USF would place an order with Private Brands which would, in turn, place the order for the corn with the supplier for the price of $10 a case. Private Brands would pretend to re-sell the corn to USF for $14. Accordingly, Private Brands would bill USF $14 for the case of corn.

53.    The $4 that Private Brands increased the price of the corn above the price USF negotiated with the corn supplier was called a "bucket." After USF paid Private Brands the $14, Private Brands would kick-back the "bucket," *i.e.*, the difference between the $14 and USF's previously negotiated price of $10, or $4, directly to USF minus a small pre-determined transaction fee for each invoice.

54.    In some cases, the corn supplier would also agree to provide an unearned promotional allowance. During the early days of the scheme, the supplier would first pay the promotional allowance to Private Brands and Private Brands would forward the promotional allowance to USF (in addition to the $4 "bucket"). Later, USF directed the supplier to pay the unearned promotional allowance on transactions funneled through Private Brands directly to USF.

55.    USF would then calculate the cost component used to bill its customers using the $14 from the Private Brands transaction. On information and belief, USF would book the $4 "bucket" in its accounting records as if it represented an earned, commercially reasonable promotional allowance paid by a supplier.

56.    However, the $4 added by Private Brands to the cost of the corn in the above example was not an earned promotional allowance or other commercially reasonable rebate. Private Brands was not a real supplier. It was merely a straw-man posing as a supplier.

57.    The "buckets" of money sent from the VASPs to USF thus were structured to look like honestly earned and commercially reasonable rebates or promotional allowances when in fact they were not. The bucket payments also were designed to hide from USF's customers the "cost" falsely added by the scheme to USF's invoices.

58.    USF deceived its customers into believing that USF's cost component was calculated based on using transactions with only legitimate suppliers. The scheme was designed to, and did,

12

1  induce USF's customers to rely on USF's material representations, enter into contracts with USF, place

2  orders for products from USF, and make payments to USF.  Moreover, such reliance was reasonable

3  under the circumstances because Defendants intentionally used the VASPs to hide the scheme from

4  USF's customers and concealed from, and at no time fully disclosed to, USF's customers the existence

5  and true purpose of the VASPs.

6       59.    Another company owned by Defendant Redgate, Commodity Management, was used in

7  the same way that USF controlled and operated Private Brands.

8       60.    On information and belief, four companies owned by Defendant Schofield were also set

9  up at USF's direction and operated like Private Brands as VASPs.  Those companies were Frozen

10  Farms, Produce Solutions, Seafood Marketing Specialists, and Specialty Supply & Marketing.  They

11  were all similar to Private Brands in that they were set up at USF's direction to falsely create a spread

12  on the cost of products USF sold to its customers.

13       61.    Upon information and belief, each VASP operated in a substantially similar manner

14  throughout the relevant period.

15       2.    **Commercially Unreasonable Promotional Allowances**

16       62.    Under another scheme, USF would enter into an agreement with a supplier under which

17  the supplier would agree to a price for the sale of the goods.  Thereafter, the supplier would agree to

18  issue an invoice to USF with a price higher than the supplier otherwise would have charged to USF,

19  while at the same time agreeing to give USF a higher and off-setting unearned promotional allowance.

20       63.    As an example, a supplier's regular price for an item might be $1.20 and under normal

21  circumstances the supplier would give the distributor an earned 20 cent promotional allowance, thus

22  accepting a price of $1.00.  In that instance, USF's invoice cost, the cost used to calculate the cost

23  component billed to its customers and on which its mark-up would be added, would be $1.20.

24       64.    Under USF's scheme, however, USF would persuade the supplier to invoice USF $1.40

25  and then rebate 40 cents to USF which would include the normal earned 20 cent promotional

26  allowance and another 20 cents that was unrelated to any earned promotional allowances or rebates.

27  Under the scheme, thus, the invoice cost used to calculate the cost component would be $1.40 – rather

28

13

COMPLAINT

1    than $1.20 – even though the supplier's net price was the same as it would have been in the absence of

2    the scheme.

3         65.     In fact, however, the falsely inflated 20 cent payment to USF represented an amount

4    that would otherwise not have been offered as a promotional allowance and exceeded the amount of

5    promotional allowance the supplier was otherwise willing to pay. That additional 20 cent payment was

6    not a commercially reasonable promotional allowance paid by the supplier or earned by USF.

7         66.     The effect of the scheme was also to allow USF to overcharge its customers by enabling

8    USF to compute the cost-plus price charged to its customers based on a falsely inflated cost

9    component.

10        **C.     Premier's Contracts with USF and CHW's USF Purchases**

11        67.     Effective June 30, 2000, Premier and USF's predecessor Alliant entered into the

12   Premier contract, which was in effect until June 29, 2005. From 2000 to 2004, this contract was

13   modified three times with "Alliant Foodservice, Inc. d/b/a U.S. Foodservice" executing the

14   amendments as the foodservice distributor. In 2005, this contract was modified again with "U.S.

15   Foodservice" executing the amendment as the foodservice distributor.

16        68.     The Premier contract permitted Premier's Members who desired to participate in the

17   contract benefits ("Participating Members") to designate USF as their "sole-source national broadline

18   food and supply foodservice distributor."

19        69.     The Premier contract also provides that Participating Members are third-party

20   beneficiaries of the contract, and are entitled to enforce certain terms and provisions of the agreement

21   to the same extent as Premier, including but not limited to the terms and provisions at issue here.

22        70.     Premier Participating Members' purchases from USF (and its predecessor Alliant)

23   totaled approximately $3.5 billion from 2000 to 2005.

24        71.     CHW has been a Premier Member since 1999. Over a two and a half year period, from

25   2001 to 2004, CHW spent approximately $71.1 million on food-related products purchased from USF

26   pursuant to the Premier contract.

27        72.     Shortly after USF acquired Alliant, USF converted Premier's Participating Members

28   from purchasing Alliant products to USF private label and signature brand products, many of which

                                                14

COMPLAINT

1   were purchased through the VASPs. At the time, Premier's Participating Members were purchasing

2   between $700 and $850 million in products from USF each year. On information and belief, CHW

3   purchased USF private label and signature brand products including Patuxent Farms, U.S. Red, U.S.

4   Blue, Monarch, Glenview Farms, Thirster, Roseli, Perfecta, el Pasado Mexican Cuisine, and

5   Monogram products.

6       73.    The Premier contract required USF to bill Participating Members a price equal to a cost

7   component plus a distribution fee or mark-up. The distribution fee was expressed as a percentage or as

8   a fixed dollar amount. The price charged to Participating Members was to equal the cost component

9   plus the agreed on mark-up less any promotional allowance exclusively negotiated by Premier or

10  negotiated on the behalf of Premier.

11      74.    For many products, the price listed on the invoice issued by USF's vendors or other

12  similar types of entities was to be used in calculating the cost component.

13  **D.**    **USF's Pattern of Defrauding CHW and other Class Members**

14      75.    USF's dummy sales dealings with the VASPs and its falsely inflated promotional

15  allowances with suppliers were self-contained schemes that operated independently from any single

16  contract with Premier, CHW or USF's other customers. USF's schemes were not specifically designed

17  to defraud only Premier and its Participating Members, including CHW, but rather represented a

18  systematic way of doing business that was independent of any particular contract or specific customer.

19      76.    On information and belief, between 2000 and 2004, USF engaged in thousands of

20  separate fraudulent transactions in furtherance of its schemes to falsely inflate the cost component of

21  the price charged to its customers. Details regarding the dates, times, products purchased, and the

22  amount of the false spread added by the VASPs, which occurred on a daily basis for a period of several

23  years from at least 2000 until 2004, remain in the exclusive control of Defendants.

24      77.    USF's schemes to defraud its customers by falsely inflating the cost component of the

25  price were further concealed under the guise of complying with the terms of its cost-plus contractual

26  arrangements. USF utilized the VASPs and the other methods of deception described above to falsely

27  inflate the cost component of the price charged to USF's customers since at least 2000, and continued

28  to operate the schemes, as described above, at least until 2004. Since at least 2000, USF has repeatedly

15

COMPLAINT

1  and regularly conducted the schemes described above for the specific purpose of obtaining money or

2  property that rightfully belongs to its customers.

3        **E.**    **Royal Ahold's Participation in the Schemes**

4        78.    Prior to, and as part of, its acquisition of USF, Royal Ahold was aware of weaknesses in

5  USF's ability to track promotional allowances and a lack of an internal control system.

6        79.    Prior to, and as part of, its acquisition of USF, Royal Ahold was aware that the VASPs'

7  purpose was to "shelter and earn similar 'rebates' on [USF's] private label brands and to hide PA's

8  [promotional allowances] from clients' auditors." *See* PricewaterhouseCoopers Report on U.S.

9  Foodservice, Ex. 2 (June 25, 2003).

10        80.    In fact, on or about February 20, 2000, an email memorandum about the existence and

11  purpose of the VASPs was sent by Royal Ahold's Vice President of Internal Audits, Paul Ekelschot, to

12  Royal Ahold executives Cees van der Hoeven (Royal Ahold CEO), Michiel Meurs (Royal Ahold

13  CFO), Jan Andreae (Royal Ahold Executive Board Member), Allan Noddle (Royal Ahold Executive

14  Board Member), Robert Tobin (Royal Ahold Executive Board Member), Ton van Tielraden (Royal

15  Ahold Senior Vice-President Legal Affairs and General Counsel), Andre Buitenhuis (Royal Ahold

16  Senior Vice President Finance and Fiscal Affairs), Bert Verhelst (Royal Ahold Senior Vice-President

17  Administration), Ernie Smith (Royal Ahold USA CFO), Carol Greczner (Royal Ahold USA Senior

18  Vice-President Audit), and David Herskovits (Deloitte Auditor). See E-mail from Paul Ekelschot to

19  Cees van der Hoeven, et al. (Feb. 20, 2000) (attached hereto as Exhibit 1). None of these board

20  members are currently serving at Royal Ahold.

21        81.    Moreover, in 2001, USF's president and Chief Executive Officer since 1997, Jim Miller,

22  was appointed to the Royal Ahold Corporate Executive Board.

23        82.    In addition to its full knowledge about the existence and purpose for the VASPs, Royal

24  Ahold guaranteed certain obligations of the VASPs relating to purchases made on behalf of USF. As of

25  December 29, 2002, those guarantees totaled approximately 221 million euros. On information and

26  belief, Royal Ahold used financial institutions, the mails and/or the wires, as specified below, in

27  providing such guarantees.

28

16

COMPLAINT

83.    Thus, Royal Ahold was aware of the true nature and purpose of the VASPs and knowingly provided financial guarantees to the VASPs to aid USF in carrying out its VASP scheme.

84.    Royal Ahold continued to provide these guarantees after receiving a memorandum on April 12, 2001, from former USF CFO Ernie Smith, that stated that the VASPs "allow them to establish pads to income." See Memorandum from Ernie Smith to Michiel Meurs (Apr. 12, 2001) (attached hereto as Exhibit 2).

85.    Royal Ahold's guarantees furthered the operation of the enterprises alleged herein and Royal Ahold participated with USF in continuing, executing, profiting from and concealing the VASP scheme.

86.    As part of such participation, Royal Ahold sought and obtained a legal opinion in or around 2000 about the operation of the VASP scheme which was later withdrawn as improvidently provided. At a minimum, this legal opinion was designed to further, and did conceal the VASP scheme from USF's customers.

F.    **Royal Ahold's Financial Restatement and Civil and Criminal Investigations of U.S. Foodservice**

87.    On February 24, 2003, Royal Ahold announced that its net earnings and earnings per share would be lower than previously indicated for 2002. Royal Ahold also said it would restate its financial statements for fiscal years 2000 and 2001.

88.    Royal Ahold indicated that the restatements were caused by overstatements of vendor allowance income at its USF subsidiary. The fraud stemmed from USF's booking of inflated and not yet earned promotional allowances from suppliers.

89.    Following the accounting restatements, the SEC, DOJ and Netherlands authorities launched parallel investigations into USF's conduct. As a result of those investigations, in October 2004, the SEC charged Royal Ahold and its top three executives with securities fraud. Royal Ahold and two former executives settled the charges on October 18, 2004. Subsequently, in May 2006, Royal Ahold's former CEO and CFO were convicted of fraud in the Netherlands. Additionally, four former USF executives—Michael Resnick, CFO, Mark Kaiser, Chief Marketing Officer, Timothy Lee, EVP of

17

1  Purchasing, and William Carter, VP of Purchasing, Supply Chain—have been convicted of or pled

2  guilty to criminal charges arising from the accounting fraud.

3      90.    At least a dozen co-conspirators from the VASPs and USF's suppliers have pled guilty

4  to fraud, conspiracy and/or insider trading. In November 2005, Royal Ahold settled a U.S. shareholder

5  class action for $1.1 billion.

6      91.    Nevertheless, Royal Ahold has continued to issue misleading and false statements about

7  the role of the VASPs. In its 2002 Form 20-F, issued on October 16, 2003, for example, Royal Ahold

8  first disclosed the existence of the VASPs to its shareholders and suggested that they had a legitimate

9  economic role in the distribution chain by claiming that the VASPs "purchase[d] certain commodities

10  and products from third parties" and that they then resold such products to USF.

11      92.    Moreover, Royal Ahold falsely implied in the same Form 20-F that the VASPs were

12  legitimate participants in the distribution chain when it said that the VASPs "provide varying degrees

13  of support to USF primarily in the purchase of private label and signature brand products." In fact, the

14  only "support" provided by the VASPs were as vehicles through which the Defendants conducted the

15  VASP scheme.

16      93.    In the same Form 20-F, Royal Ahold likewise misleadingly described the VASPs' role

17  when it described the purpose of USF's direct negotiations with the suppliers from whom the VASPs

18  placed orders on behalf of USF. Royal Ahold stated that the purpose of those direct negotiations was

19  to "ensure price, product specifications and quality requirements" when in fact the real purpose of

20  those direct negotiations was to manage and control the VASPs' transactions with those suppliers.

21      94.    Royal Ahold's disclosure about the VASPs in its 2002 Form 20-F was designed to give

22  the appearance of "full disclosure," while in reality continuing to shroud in a false and misleading light

23  the true nature of the VASP scheme. As a result, USF's customers were, at best, further misled and

24  prevented from learning the true nature of the VASP scheme, at the time of Royal Ahold's so-called

25  disclosure.

26      95.    In 2006, USF also sent correspondence to customers denying any wrongdoing with

27  regard to the VASP scheme. All such disclosures and correspondence were designed to protect and

28

18

COMPLAINT

1  retain the benefits Defendants and their shareholders wrongfully obtained through the operation and

2  execution of the VASP scheme.

### COUNT I

**Violation of RICO, 18 U.S.C. § 1962(c): Against Defendants Royal Ahold, U.S. Foodservice, Redgate and Schofield for Conducting the Affairs of the VASP Enterprise through a Pattern of Racketeering Activity**

96.    Plaintiff repeats and re-avers each and every statement contained in Paragraphs 1 through 95 above.

97.    Defendants Royal Ahold, USF, Redgate and Schofield are all "persons" capable of holding a legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

98.    Defendants Royal Ahold, USF, Redgate and Schofield have violated 18 U.S.C. § 1962(c) by the acts described in the prior paragraphs, and as further described below.

### The VASP Enterprise

99.    Defendant USF, together with Frozen Farms, Produce Solutions, Seafood Marketing Specialists, Specialty Supply & Marketing, Commodity Management, and Private Brands form an association-in-fact for the common and continuing purpose described herein including Paragraphs 40 to 61 above, and constitute an enterprise within the meaning of 18 U.S.C. § 1961(4) (the "VASP Enterprise"). The members of the VASP Enterprise have functioned as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity. The VASP Enterprise has been engaged in, and its activities have substantially affected, interstate commerce.

### The Pattern of Racketeering Activity

100.    Defendants Royal Ahold, USF, Redgate and Schofield, each of whom are persons associated with, or employed by, the VASP Enterprise, did knowingly, willfully and unlawfully conduct or participate, directly or indirectly, in the affairs of the VASP Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c). The racketeering activity was made possible by each Defendant's regular and repeated use of the facilities and services of the VASP Enterprise. Defendants Royal Ahold, USF, Redgate and Schofield had the specific intent to engage in the substantive RICO violation alleged herein.

19

COMPLAINT

1      101.    Predicate acts of racketeering activity are acts which are indictable under provisions of

2 the U.S. Code enumerated in 18 U.S.C. § 1961(1)(B), as more specifically alleged below. Defendants

3 Royal Ahold, USF, Redgate and Schofield each committed at least two such acts or else aided and

4 abetted such acts.

5      102.    The acts of racketeering were not isolated, but rather the acts of Defendants Royal

6 Ahold, USF, Redgate and Schofield were related in that they had the same or similar purpose and

7 result, participants, victims and methods of commission. Further, the acts of racketeering by

8 Defendants Royal Ahold, USF, Redgate and Schofield have been continuous. There was repeated

9 conduct in a closed, but substantial, period of time at least during the period from 2000 to 2004.

10                                    **Mail Fraud**

11      103.    Defendants committed acts constituting indictable offenses under 18 U.S.C. § 1341, in

12 that they devised or intended to devise a scheme or artifice to defraud CHW and other Class members,

13 or to obtain money or property from CHW and other Class members by means of false or fraudulent

14 pretenses, representations or promises. For the purpose of executing their scheme or artifice,

15 Defendants caused delivery of various documents and things by the U.S. mails or by private or

16 commercial interstate carriers, or received such therefrom. The acts of Defendants set forth above

17 were done with knowledge that the use of the mails would follow in the ordinary course of business, or

18 that such use could have been foreseen, even if not actually intended. These acts were done

19 intentionally and knowingly with the specific intent to advance Defendants' scheme or artifice.

20      104.    Defendants carried out their scheme in different states and could not have done so

21 unless they used the U.S. mails or private or commercial interstate carriers. One part of Defendants'

22 VASP scheme required USF to send directions to the VASPs to place orders for products at prices

23 negotiated by USF and for the VASPs to then send falsely inflated invoices to USF. USF also provided

24 interest-free loans, and Royal Ahold provided financial guarantees, to the VASPs. Another part of

25 Defendants' fraudulent scheme involved USF sending falsely inflated invoices or other demands for

26 payment to its customers, including CHW and other Class members. Upon information and belief, in

27 connection with the sending or receipt of such materials, Defendants caused to be delivered interstate

28

20

COMPLAINT

1  communications that contained false or fraudulent statements, or things not themselves false or

2  fraudulent but which were essential parts of Defendants' scheme.

3      105.   In furtherance of the VASP scheme, Royal Ahold disseminated its 2002 Form 20-F and

4  other correspondence about the VASPs through the U.S. mails and over U.S. wires.

5                          **Wire Fraud**

6      106.   Defendants committed acts constituting indictable offenses under 18 U.S.C. § 1343, in

7  that they devised or intended to devise a scheme or artifice to defraud CHW and other Class members,

8  or to obtain money or property from CHW and other Class members by means of false or fraudulent

9  pretenses, representations or promises.  For the purpose of executing their scheme or artifice,

10  Defendants transmitted or caused to be transmitted by means of wire communications in interstate or

11  foreign commerce various writings, signs, and signals.  These acts were done intentionally and

12  knowingly with the specific intent to advance Defendants' scheme or artifice, or with knowledge that

13  the use of the wires communications would follow in the ordinary course of business, or that such use

14  could have been foreseen, even if not actually intended.

15      107.   Defendants carried out their scheme in different states and countries and could not have

16  done so unless they used the interstate wires.  Upon information and belief, Defendants used the

17  interstate wires on a daily basis when sending directions to the VASPs to place orders for products at

18  prices negotiated by USF and when the VASPs then sent falsely inflated invoices to USF.  USF also

19  provided interest-free loans, and Royal Ahold provided financial guarantees, to the VASPs that also,

20  upon information and belief, required, and were furthered by, the use of interstate wires.  Likewise,

21  upon information and belief, USF regularly used the wires to send falsely inflated invoices or other

22  demands for payment to its customers, including CHW and other Class members.  USF thereby used

23  the wires thousands of times to transmit false and fraudulent statements, or communications

24  themselves not false or fraudulent but which were essential to carrying out Defendants' scheme.

25

26

27

28

                              21

## Money Laundering

108.     Defendants committed acts constituting indictable offenses under 18 U.S.C. § 1956 in that, knowing that funds they received from CHW and other Class members constituted the proceeds of unlawful activity including mail and wire fraud, Defendants conducted and attempted to conduct certain financial transactions affecting interstate commerce involving these proceeds.

109.     These proceeds were the portions of payments received by USF from CHW and other Class members as a result of the scheme alleged herein, *i.e.*, payments for the falsely inflated cost components used by USF to calculate the price charged to its customers, and payments for USF's increased mark-ups or distribution fees resulting from USF's use of falsely inflated costs to calculate such mark-ups or distribution fees.

110.     Upon information and belief, the financial transactions conducted by Defendants affecting interstate commerce involved the deposit and withdrawal of these proceeds in and from financial institutions, as well as the movement of these proceeds by wire or other means between USF and the VASPs, and between the VASPs and USF as part of the scheme alleged herein.

111.     These financial transactions conducted by Defendants were intended to promote the carrying on of the mail and wire fraud by making the VASPs appear to have a legitimate business purpose, and to hide from CHW and other Class members the false "cost" added to USF's invoices.

112.     Defendants further had knowledge that these financial transactions were designed to, and did, conceal and disguise the nature, location, source, ownership or control of the proceeds of the mail and wire fraud, by making it appear that the full invoice amount belonged to the VASPs, when in fact the VASPs kicked back a portion of the invoice price, representing the proceeds of the mail and wire fraud, to USF, and thus hiding the falsely inflated cost component from its clients' auditors.

113.     Defendants committed acts constituting indictable offenses under 18 U.S.C. § 1957 in that they knowingly engaged in and attempted to engage in monetary transactions affecting interstate commerce and involving funds received from CHW and other Class members, which Defendants knew to be the proceeds of mail and wire fraud and criminally derived property from unlawful activity as described above, of a value greater than $10,000.

22

114.    Defendants, upon information and belief, deposited these funds in financial institutions, and withdrew, transferred and exchanged such funds from those financial institutions.

**Injury to CHW and other Class Members' Business or Property**

115.    CHW and the Class have been proximately injured in their business or property by reason of Defendants' violation of 18 U.S.C. § 1962(c).

**COUNT II**

**Violation of RICO, 18 U.S.C. § 1962(c):  Against Defendants Royal Ahold, U.S. Foodservice, Redgate and Schofield for Conducting the Affairs of the Individual VASP Enterprises through a Pattern of Racketeering Activity**

116.    Plaintiff repeats and re-avers each and every statement contained in Paragraphs 1 through 115 above.

117.    Defendants Royal Ahold, USF, Redgate and Schofield are all "persons" capable of holding a legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

118.    Defendants Royal Ahold, USF, Redgate and Schofield have violated 18 U.S.C. § 1962(c) by the acts described in the prior paragraphs, and as further described below.

**The Individual VASP Enterprises**

119.    The Private Brands, Commodity Management, Frozen Farms, Produce Solutions, Seafood Marketing Specialists, and Specialty Supply & Marketing Enterprises each constitute a separate enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Individual VASP Enterprises"). Each Individual VASP Enterprise has been engaged in, and their activities have substantially affected, interstate commerce.

**The Pattern of Racketeering Activity**

120.    Defendants Royal Ahold, USF, Redgate, and Schofield knowingly participated in, directly or indirectly, the operation and management of each of the Individual VASP Enterprises through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c).  The racketeering activity was made possible by each Defendant's regular and repeated use of the facilities and services of each Individual VASP Enterprise.  Defendants Royal Ahold, USF, Redgate and Schofield had the specific intent to engage in the substantive RICO violation alleged herein.

23

COMPLAINT

121.    The predicate acts of racketeering activity are acts which are indictable under provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(1)(B), as more specifically alleged below. Defendants Royal Ahold, USF, Redgate and Schofield each committed at least two such acts or else aided and abetted such acts.

**Mail Fraud**

122.    Plaintiff repeats and re-avers each and every statement contained in Paragraphs 103 to 105 above.

**Wire Fraud**

123.    Plaintiff repeats and re-avers each and every statement contained in Paragraphs 106 and 107 above.

**Money Laundering**

124.    Plaintiff repeats and re-avers each and every statement contained in Paragraphs 108 to 114 above.

**Injury to CHW and other Class Members' Business or Property**

125.    CHW and the Class have been proximately injured in their business or property by reason of Defendants' violation of 18 U.S.C. § 1962(c).

**COUNT III**

**Violation of RICO, 18 U.S.C. § 1962(d):  Against Defendants Royal Ahold, U.S. Foodservice, Redgate and Schofield**

126.    Plaintiff repeats and re-avers each and every statement contained in Paragraphs 1 through 125 above.

127.    In violation of 18 U.S.C. § 1962(d), Defendants Royal Ahold, USF, Redgate, and Schofield conspired to violate § 1962(c).  The conspiracy commenced at least as early as 2000 and continued at least until 2004.

128.    The object of the conspiracy was to use dummy corporations to falsely inflate invoices to obtain money or property rightfully belonging to CHW and other Class members.

129.    Each Defendant knowingly, willfully and unlawfully agreed and combined to conduct or participate, directly or indirectly, in the conduct of the affairs and activities of the VASP Enterprise and/or the Individual VASP Enterprises through a pattern of racketeering activity, including acts

24

COMPLAINT

1  indictable under 18 U.S.C. §§ 1341 and 1343, in violation of 18 U.S.C. § 1962(c). Royal Ahold, USF,

2  Redgate, and Schofield each objectively manifested their agreement to the commission of the

3  substantive RICO violations by at least one member of the conspiracy by words or acts.

4       130.  Each Defendant committed at least one overt act of racketeering or other wrongful

5  activity in furtherance of such conspiracy.

6       131.  Even if some of the Defendants did not agree to harm specifically CHW or other Class

7  members, the purpose of the acts that caused them injury was to advance the overall object of the

8  conspiracy, and the harm to CHW or other Class members was a reasonably foreseeable consequence

9  of Defendants' VASP scheme.

10            **Injury to CHW and other Class Members' Business or Property**

11       132.  CHW and the Class have been proximately injured in their business or property by

12  reason of Defendants' violation of 18 U.S.C. § 1962(d).

13                  **COUNT IV**

14                  **Breach of Contract**

15       133.  Plaintiff repeats and re-avers each and every statement contained in Paragraphs 1

16  through 132 above.

17       134.  Plaintiff and other Class members entered into contracts with USF or its predecessors

18  under which CHW and other Class members purchased food and other products from USF pursuant to

19  a cost-plus contractual arrangement. CHW and other Class members complied with all of their

20  obligations under the contracts.

21       135.  The terms of these contracts provided that the price charged by USF to CHW and other

22  Class members was to be based on a cost component plus a distribution fee or mark-up. The

23  distribution fee was expressed as a percentage of the cost component or as a fixed dollar amount for

24  certain products. For certain products, these contracts calculate the cost component of the price

25  charged to USF's customers by using the invoice issued by USF's vendors or other similar types of

26  entities.

27       136.  USF repeatedly used invoice costs from the VASPs to calculate the cost component of

28  the price billed to its customers.

25

COMPLAINT

137.    The VASPs, or other entities operated in a substantially similar manner, are not the type of entity from which the contract permits USF to use an invoice to calculate the cost component of the price billed to its customers.

138.    USF did not have the discretion to use the invoice costs from the VASPs, or other entities operated in a substantially similar manner, to calculate the cost component of the price billed to its customers.

139.    USF breached the contracts with, and the reasonable expectations of, CHW and other Class members by using invoice costs from the VASPs, or other entities operated in a substantially similar manner, to calculate the cost component of the price billed to its customers.

140.    USF further breached the terms of its contracts with CHW and other Class members by acting dishonestly and in a commercially unreasonable manner to manipulate the invoice costs (as described in more detail above) used to calculate the cost component of the price charged to its customers.

141.    CHW and the Class were injured by having paid higher prices for the food and other products they purchased from USF than they otherwise would have paid had USF not breached its contracts.

## COUNT V

### Fraudulent Inducement, Concealment and Nondisclosure by USF

142.    Plaintiff repeats and re-avers each and every statement contained in Paragraphs 1 through 141 above.

143.    At no time prior to entering into contracts with Premier, CHW or other Class members, or during the course of such agreements, did USF ever fully disclose the creation, existence, use and exploitation of the VASPs. Although Royal Ahold partially disclosed the existence of the VASPs on October 16, 2003, such disclosures were misleading and incomplete, as described in Count VI below.

144.    USF had a duty to disclose such facts to CHW and other Class members, but instead actively concealed and suppressed certain material facts in order to represent that what it disclosed was the whole truth. By representing itself as a legitimate broadline food distributor, USF created the false impression that it would purchase goods only from bona fide manufacturers, wholesalers, suppliers,

26

COMPLAINT

1  and other food product purveyors with genuine business and economic substance, but intentionally

2  concealed and/or did not disclose the fact that it interposed into the supply chain sham entities whose

3  essential purpose was to defraud its customers. Also, USF represented to CHW and other Class

4  members that it would retain the benefit of (and not pass through to its customers) certain promotional

5  allowances or similar supplier incentives, but intentionally concealed and/or did not disclose its plan to

6  create sham entities, and to falsely characterize the "buckets" of money it received from such sham

7  entities as legitimate promotional allowances.

8      145.   USF knew CHW and other Class members were ignorant of such facts and did not have

9  an equal opportunity to discover such facts.

10     146.   USF's concealment of and failure to disclose such facts constituted material

11  misrepresentations. USF acted with malice, oppression or fraud.

12     147.   As a direct result of those misrepresentations, USF induced Premier (for the benefit of

13  its members), CHW and other Class Members to enter into contracts with USF, place orders for

14  products from USF and make payments to USF.

15     148.   USF intended Premier, CHW and other Class members to rely on the misrepresentations

16  and to enter into contracts, place orders and make payments based on such misrepresentations.

17     149.   Premier, CHW and other Class members reasonably relied on USF's misrepresentations

18  when they entered into contracts, placed orders and made payments to USF.

19     150.   As a result of being induced to enter into contracts, place orders and make payments for

20  products from USF without knowledge of USF's creation, use and exploitation of the VASPs, CHW

21  and other Class members were injured by having paid higher prices for the food and other products

22  purchased from USF.

### COUNT VI

### Fraudulent Inducement, Concealment and Nondisclosure by Royal Ahold

25     151.   Plaintiff repeats and re-avers each and every statement contained in Paragraphs 1

26  through 150 above.

27

28

27

COMPLAINT

152.    Although Royal Ahold was aware of USF's VASP scheme prior to its purchase of USF, it concealed and failed to disclose the existence of the VASPs until October 16, 2003, when it made incomplete and misleading statements about the VASPs in its 2002 Form 20-F.

153.    In its 2002 Form 20-F, Royal Ahold stated that the VASPs "purchase[d] certain commodities and products from third parties" and resold such products to USF, claimed that the VASPs "provide varying degrees of support to USF primarily in the purchase of private label and signature brand products," and claimed that the purpose of USF's direct negotiations with suppliers who subsequently received "orders" from the VASPs was to "ensure price, product specifications and quality requirements."

154.    Such statements were false and misleading. Royal Ahold made partial representations about the VASPs but at the same time intentionally suppressed and concealed the true purpose of the VASPs, i.e., to falsely create a "spread" on the goods that USF sold to its customers, and "hide PA's [promotional allowances] from clients' auditors." As a result of its actions, Royal Ahold had a duty to disclose such facts to CHW and other Class Members.

155.    Royal Ahold knew CHW and other Class members were ignorant of such facts and did not have an equal opportunity to discover such facts.

156.    Royal Ahold's misleading statements about the VASPs and its concealment of and failure to disclose the true nature and purpose of the VASPs constituted material misrepresentations. Royal Ahold acted with malice, oppression or fraud.

157.    As a direct result of those misrepresentations, Royal Ahold induced CHW and other Class Members to enter into contracts with its wholly-owned subsidiary, USF, to place orders for products from USF, and make payments to USF.

158.    Royal Ahold intended CHW and other Class members to rely on the misrepresentations and to enter into contracts, place orders and make payments based on such misrepresentations.

159.    CHW and other Class members reasonably relied on Royal Ahold's misrepresentations when they entered into contracts, placed orders and made payments to USF.

160.    As a result of being induced by Royal Ahold's misrepresentations to enter into contracts, place orders and make payments for products to USF, CHW and other Class members were

28

1    injured by having paid higher prices for the food and other products purchased from USF after such

2    misrepresentations were made than they otherwise would have paid if Royal Ahold had been

3    forthcoming in its statements.

### COUNT VII

**Violation of California Business and Professions Code §§ 17200 *et seq.*:  Against Defendants Royal Ahold, U.S. Foodservice, Redgate and Schofield for Unlawful, Unfair and Fraudulent Business Practices**

7        161.    Plaintiff repeats and re-avers each and every statement contained in Paragraphs 1

8    through 160 above.

9        162.    Defendants Royal Ahold, USF, Redgate, and Schofield have engaged in unlawful, unfair

10   and fraudulent business acts or practices within the meaning of California Business & Professions

11   Code §§ 17200 *et seq.* in connection with their illegal overcharge schemes, as described above.

12   Defendants used these illegal overcharge schemes with the intent, directly or indirectly, to dispose of

13   CHW and other California Class members' property through the use of falsely inflated invoices.

14       163.    To do so, Defendants engaged in unlawful business acts or practices within the meaning

15   of California Business & Professions Code §§ 17200 *et seq.* by, as described above, conducting the

16   affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c);

17   conspiring to conduct the affairs of an enterprise in violation of 18 U.S.C. 1962(d); violating the

18   federal mail fraud statute, 18 U.S.C. § 1341; violating the federal wire fraud statute, 18 U.S.C. § 1343;

19   and violating the federal money laundering statutes, 18 U.S.C. §§ 1956 and 1957.

20       164.    Further, Defendants engaged in unfair and fraudulent business acts or practices in

21   violation of California Business & Professions Code §§ 17200 *et seq.* by, among other things, setting

22   up shell companies, inventing sham transactions, and creating phony invoices used to bill CHW and

23   other California Class members.

24       165.    These business acts or practices constituted a pattern of behavior that victimized CHW

25   and other California Class members by deceiving them into believing that USF's cost component was

26   calculated based on transactions with only legitimate suppliers.

27

28

29

COMPLAINT

166.    As a direct and foreseeable result of Defendants' violations, CHW and other California Class members suffered substantial monetary losses by having paid higher prices for the food and other products they purchased from USF.

### COUNT VIII

#### Unjust Enrichment Against Defendant Royal Ahold

167.    Plaintiff repeats and re-avers each and every statement contained in Paragraphs 1 through 166 above.

168.    Royal Ahold knew about the existence, use, and execution of the VASP scheme.

169.    By guaranteeing certain obligations of the VASPs relating to purchases made on behalf of USF, Royal Ahold assisted USF in carrying out its VASP scheme.

170.    As a result of the acts alleged, Plaintiff and Class members paid inflated product prices for purchases from USF.  The payment of these overcharges represents an unjust benefit the Plaintiff and Class members conferred upon Royal Ahold.

171.    Royal Ahold accepted and retained the proceeds of these illegal acts and thus, was unjustly enriched by these illegal overcharges.  Equity requires disgorgement to prevent Royal Ahold from benefiting from the retention of the Plaintiff's and Class members' property.

172.    Plaintiff and Class members seek an order directing Royal Ahold to return the benefit Royal Ahold unjustly procured, received, and retained from the schemes alleged herein.

### COUNT IX

#### Imposition of Constructive Trust Against Defendant Royal Ahold

173.    Plaintiff repeats and re-avers each and every statement contained in Paragraphs 1 through 172 above.

174.    The Court should impose a constructive trust on all monies, currency, profits, negotiable instruments, promissory notes and interests in property, both real and personal, which Royal Ahold acquired as a result of the schemes described herein, including but not limited to any proceeds Royal Ahold receives from its sale of USF.  Royal Ahold holds Plaintiff and Class members' funds as a constructive trustee for the benefit of Plaintiff and Class members.

COMPLAINT

175.    Plaintiff and Class members are unaware of the total amount of funds attributable to the VASP and promotional allowance schemes Royal Ahold currently holds.  However, these amounts are traceable to the transactions in which Plaintiff and Class members were overcharged for purchases from USF.

## PRAYER FOR RELIEF

WHEREFORE, Catholic Healthcare West, on behalf of itself and the Class, respectfully prays for a judgment against Defendants, jointly and severally, as follows:

(i)    Determining that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23, be given to the Class;

(ii)    As to all Counts, damages in an amount to be determined at trial;

(iii)    As to Counts I to III, trebling of damages;

(iv)    As to Counts I to III, disgorgement;

(v)    As to Counts I to III, injunctive relief preventing Defendants from violating the RICO statute;

(vi)    As to Counts I to III, the costs, expenses, and fees, including reasonable attorneys' fees, of prosecuting this action;

(vii)    As to Counts V and VI, exemplary or punitive damages for Defendants' intentional, willful or malicious misconduct;

(viii)    As to Count VII, for restitution and disgorgement of monies pursuant to the California Business and Professions Code;

(ix)    As to Count VIII, for restitution and disgorgement; and

(x)    As to Count IX, for imposition of a Constructive Trust.

Such further relief that may be granted in the interests of justice.

Plaintiffs hereby demand a trial by jury on all issues so triable.

31

COMPLAINT

1

Dated: August 17, 2007

2                                      AKIN GUMP STRAUSS HAUER & FELD LLP
                                       Steven Kaufhold
3

4                                      By  Steven  Kaufhold, a

5

6   R. Laurence Macon (*pro hac vice* to be filed)      Richard L. Wyatt, Jr. (*pro hac vice* to be filed)
7   Karen Kroesche Gulde (*pro hac vice* to be filed)   Todd M. Stenerson (*pro hac vice* to be filed)
    **Akin Gump Strauss Hauer & Feld LLP**              **Akin Gump Strauss Hauer & Feld LLP**
8   300 Convent Street, Suite 1600                      Robert S. Strauss Building
    San Antonio, Texas 78205                            1333 New Hampshire Ave., N.W.
9   Telephone: (210) 281-7000                           Washington, D.C.  20036-1564
    Facsimile: (210) 224-2035                           Telephone: (202) 887-4000
10  lmacon@akingump.com                                 Facsimile: (202) 887-4288
    kgulde@akingump.com                                 rwyatt@akingump.com
11                                                       tstenerson@akingump.com

12

13  Gordon Ball (*pro hac vice* to be filed)
    **Ball & Scott**
14  550 West Main Street, Suite 601
    Knoxville, Tennessee  37902
15  Telephone: (865) 525-7028
    Facsimile: (865) 525-4679
16  gball@ballandscott.com

17
    Attorneys for Catholic Healthcare West
18

19

20

21

22

23

24

25

26

27

28

COMPLAINT